UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**JUWAN DEERING**,

          Plaintiff,

v.

**OAKLAND COUNTY**, a political
subdivision of the State of Michigan;
**DAVID WURTZ**; **DENISE REIS**, as
personal representative of the **ESTATE OF
GARY MILLER**; **WILLIAM HARVEY**;
**GREGORY TOWNSEND**; **RALPH MCMORRIS**;
**PHILLIP TURNER**; and, **RAYMOND JEFFRIES**,
Jointly and Severally,

          Defendants.

_____/

## COMPLAINT AND JURY DEMAND

NOW COMES Plaintiff, JUWAN DEERING, by and through his attorney,

GARRISON LAW, PC, and TREVOR B. GARRISON, and for his Complaint

against the above-named Defendants, hereby states as follows:

## INTRODUCTION

1.      Although innocent, Juwan Deering ("Deering") was convicted of five

counts of felony murder for allegedly starting a fire that killed five children in Royal

Oak Township on April 6, 2000. Deering was sentenced to life in prison without

parole.

1

2.     Despite Deering's repeated insistence that he did not start the fire, and there being no physical evidence linking him to the fire, Oakland County detectives insisted that Deering started it.

3.     For years, Oakland County detectives David Wurtz, Gary Miller, and William Harvey asked Oakland County prosecutors to charge Deering. But prosecutors declined to do so, citing insufficient evidence.

4.     But approximately six years after the fire, assistant prosecuting attorney Gregory Townsend charged Deering with five counts of felony murder.

5.     The only additional "evidence" that Townsend acquired during that time was the anticipated testimony of three jailhouse informants, who fabricated their testimony to convict Deering with the help of Townsend and Oakland County detectives.

6.     As Wurtz, Miller, Harvey, and Townsend knew, the trial testimony of the jailhouse informants was false.

7.     In addition, Wurtz, Miller, and Harvey withheld *Brady* material from the prosecutor and Deering's defense attorney. That evidence was exculpatory and had detectives disclosed it, Deering would not have been convicted.

8.     As a result of the Defendants' actions and inactions, Deering was wrongfully incarcerated in jail and prison for 5,690 days, or 15 years, six months, and 27 days.

9.      This is a cause of action under 42 U.S.C. §§ 1983 and 1988 for violating Deering's Constitutional rights.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), 1343(a)(4), and 42 U.S.C. § 1983.

11.     The amount in controversy exceeds Seventy-Five Thousand ($75,000.00) Dollars, excluding interest and costs.

12.     This Court has personal jurisdiction over the named Defendants because they either reside in the State of Michigan and/or do systematic and continuous business in Michigan.

13.     Venue lies in the Eastern District of Michigan, Southern Division, pursuant to 28 U.S.C. § 1391(b) because the events that support Plaintiff's allegations occurred in this district and because the Defendants reside in this district.

## THE PARTIES

**A.      Plaintiff**

14.     Plaintiff, JUWAN DEERING, is a resident of Oakland County in the State of Michigan.

**B.      Defendant Oakland County**

15.     Defendant, OAKLAND COUNTY, is a political subdivision of the State of Michigan duly organized to carry out governmental functions under the laws

3

of Michigan, one of the functions being to create and implement policies and practices, and to organize, operate, staff and supervise its sheriff's deputies and prosecuting attorneys.

### C.    Defendant David Wurtz

16.    Defendant, DAVID WURTZ, was employed by Oakland County as a Sheriff's Deputy, Detective, and a member of the Major Crimes Taskforce. Wurtz resided in Oakland County, State of Michigan, and was an Officer in Charge of the investigation of Deering. Wurtz was acting under color of state law during the period in question.

### D.    Defendant Denise Reis, as Personal Representative of the Estate of Gary Miller, deceased

17.    Defendant, DENISE REIS, was appointed by the Oakland County Probate Court to serve as the Personal Representative of the Estate of Gary Miller, deceased. Upon information and belief, Reis resides in Oakland County, State of Michigan.

At all times relevant, Miller was employed by Oakland County as a Sheriff's Deputy and Detective. Miller was a member of the Major Crimes Taskforce. Miller resided in Oakland County, State of Michigan, and was an Officer in Charge of the investigation of Deering. Miller was acting under color of state law during the period in question.

### E.    Defendant William Harvey

4

18.     Defendant, WILLIAM HARVEY, was employed by Oakland County as a Sheriff's Deputy and Detective. Harvey was a member of the Major Crimes Taskforce. Harvey resided in Oakland County, State of Michigan, and was an Officer in Charge of the investigation of Deering. Harvey was acting under color of state law during the period in question.

### F.     Defendant Ralph McMorris

19.     Defendant, RALPH MCMORRIS, was a jailhouse informant who testified against Deering. McMorris resided in Oakland County, State of Michigan, during the period in question.

### G.     Defendant Phillip Turner

20.     Defendant, PHILLIP TURNER, was a jailhouse informant who testified against Deering. Turner resided in Oakland County, State of Michigan, during the period in question.

### H.     Defendant Raymond Jeffries

21.     Defendant, RAYMOND JEFFRIES, was a jailhouse informant who testified against Deering. Jeffries resided in Oakland County, State of Michigan, during the period in question.

### I.     Defendant Gregory Townsend

22.     Defendant, GREGORY TOWNSEND, was employed by Oakland County as an assistant prosecuting attorney. Townsend resided in Oakland County,

State of Michigan, during the period in question. Townsend helped detectives investigate Deering and fabricated false evidence to prosecute and convict Deering. Townsend was acting under color of state law during the period in question.

## **FACTUAL ALLEGATIONS**

23.     On April 6, 2000, at 8038 Pasadena, Royal Oak Township, five children tragically died in a house fire.

24.     Marie Dean and four of her children survived.

25.     Four of the deceased children were Marie and Oliver Dean's, and the fifth child lived in the home with her father Rapalla Frame.

26.     Oliver Dean was estranged from his wife and did not live in the home.

27.     On April 7, 2000, Defendants Wurtz and Miller interviewed Oliver Dean at the VA Hospital, informed him his children passed away in the fire, and inquired about debts he owed to drug dealers.

28.     Oliver Dean told Wurtz and Miller that he had nine different drug dealers, though he did not believe they were responsible for starting the fire.

29.     Oliver Dean stated he owed Deering $50.00, but Deering never threatened him to repay it.

30.     Within 24 hours of the fire, Oakland County fire investigator James Lehtola concluded that the fire had been intentionally set with an accelerant and that the fire started on the porch.

6

31.     Multiple eyewitnesses, however, said the fire began inside the home instead of on the porch.

32.     One witness, Norman Fitzpatrick, said he ran onto the porch to bang on the front door because he saw smoke and flames coming from the inside of the house, and he was absolutely certain that the porch itself was not on fire at that time.

33.     As Fitzpatrick banged on the door, the front windows started popping, causing flames to erupt onto the porch. Fitzpatrick ran off the porch and started banging on the side of the house instead.

34.     At approximately 11:45 pm on April 6, 2000, Major Hatcher noticed the Dean house was on fire. Hatcher first saw the fire inside the living room through the front window and not on the porch.

35.     Alvin Wesson was the next-door neighbor to the south of the Dean house. Between 11:15 and 11:30 pm, Wesson saw the fire. Wesson made clear that the fire was coming from the middle windows – it was not coming from the porch.

36.     Lehtola based his opinion that the fire started on the porch on his visual examinations of the scene and witness statements from two individuals who said it looked as though the fire was on the porch when they saw it.

37.     But Lehtola's assessment that the fire was incendiary was based on two individuals who observed the fire after the windows popped, meaning they did not see the fire until Fitzpatrick ran onto and off the porch.

38.     Wurtz, Miller, and/or Harvey requested a warrant approximately four weeks after the fire. Their theory was that Deering intentionally started the fire on the front porch with an accelerant and killed five children to send Oliver Dean a message to repay Deering $50.00.

39.     On June 9, 2000, their request for a warrant was denied due to insufficient evidence.

40.     After their warrant request was denied, Wurtz, Miller, Harvey, and assistant prosecuting attorney Townsend continued to investigate Deering. The men used three jailhouse informants and placed them in Deering's cell to secure fabricated admissions from Deering.

41.     Armed with the anticipated false testimony of three jailhouse informants, Townsend authorized a warrant and charged Deering with five counts of arson and felony murder approximately six years after the fire occurred.

42.     Deering was arrested on March 3, 2006.

43.     Deering was convicted on August 1, 2006, after a trial by jury.

44.     The evidence against Deering consisted primarily of the testimony of three jailhouse informants (McMorris, Turner, and Jeffries), who testified that Deering made inculpatory statements while he was housed in jail; and the testimony of fire investigator Lehtola who testified the fire was intentionally set with an accelerant and that it started on the porch.

45.     On August 23, 2006, Deering was sentenced to life in prison without parole.

46.     At the conclusion of his direct appeal, Deering's case was referred to the Michigan Innocence Clinic, an innocence clinic based at the University of Michigan Law School. After an investigation spanning several years, the Michigan Innocence Clinic took Deering on as a client in 2016.

47.     The Innocence Clinic's investigation led to a conclusion by two leading independent fire investigators that the fire most likely started inside the house, as witnesses stated.

48.     As part of its advocacy on behalf of Deering, the Innocence Clinic initially reached out to the Oakland County Prosecutor's Office and asked it to review the validity of Deering's conviction based on arson science, and Prosecuting Attorney Karen McDonald agreed to review the case.

49.     While the arson science review was still pending, the prosecutor's office located and quickly turned over dozens of newly discovered documents relevant to the credibility of the jailhouse informants – documents that had previously not been disclosed to the defense.

50.     Upon discovering this material, Prosecutor McDonald assigned an independent special prosecutor, Beth Greenberg Morrow, to conduct a full review of the integrity of Deering's conviction.

51.     As part of her review, Ms. Morrow reviewed the entire prosecutor's office file, including the trial file, police reports, transcripts, and videotaped interviews. One of those videotaped interviews was of Timmothy Dean shortly after the fire.

52.     Timmothy Dean, age 13 at the time, was the oldest child to survive the fire and the only child who could provide investigators with information. He was also the person who discovered the fire.

53.     Because Timmothy was in the front room of the house when the fire started, and because he discovered it, he was in the best position to provide information about how the fire started, where it started, and who, if anyone, started it.

54.     A forensic interviewer first interviewed Timmothy Dean on April 19, 2000, less than two weeks after the fire. The interview was conducted at the Oakland County Sheriff's Office in an interrogation room with a hidden camera. The entire interview was recorded.

55.     The April 19, 2000 interview of Timmothy Dean is not referenced during the trial.

56.     During her review of Deering's wrongful conviction, the Special Prosecutor reviewed a videotape of the April 19, 2000 interview in the prosecutor's file. That tape was consistent and coextensive with an existing transcript of that

portion of the interview.

57.     However, the Special Prosecutor discovered that both the videotape in the prosecution file and the existing transcript did not reflect the entire interview. In fact, the existing tape and transcript only reflected the first half of Timmothy Dean's April 19, 2000 interview.

58.     A tape in the Sheriff's Department investigative file that had not been turned over to prosecutors contained the entire interview.

59.     In the newly discovered second half of the interview, Wurtz enters the interrogation room and takes over the interview from the forensic interviewer. Timmothy makes several statements exculpatory to Deering, including hearing a voice he recognized on the porch shortly before the fire.

60.     Wurtz shows Timmothy a photo lineup containing six photos. Timmothy identifies the photo in the lower-left corner as "Juwan" who lives on his street. Timmothy explicitly states that the "Juwan" in the photo is not the voice he heard that night, and that "I'm sure it's not him."  Timmothy describes a different person, "Little Juwan," who is not in the photo lineup, as the person he heard on the night of the fire. Timmothy makes clear that Juwan Deering who lives on his street, and "Little Juwan," who lives in Detroit, are not the same person.

61.     There was no reference to a photo lineup at trial or any police narrative report. Special Prosecutor Morrow found no photo lineup anywhere in the

prosecution's trial files, handwritten notes, or appellate files.

62.    The Michigan State Police subsequently conducted an independent investigation of Wurtz, Miller, and Harvey, and found a photo lineup in the Sheriff's Department investigative file. Deering's photograph is in the lower-left corner of that lineup. That photo lineup is consistent with the one shown to Timmothy because Deering's photo appears in the bottom left corner.

63.    In the portion of Timmothy's video recorded interview that was not disclosed to prosecutors or Deering's defense attorney, Timmothy unequivocally clarified that Deering, depicted in the lower-left photo, was not the person he heard on the night of the fire.

64.    Wurtz, Miller, and Harvey concealed the second half of Timmothy's April 19, 2000, interview from Deering and Oakland County prosecutors.

65.    In the second half of the recording, Timmothy also told Wurtz that he saw a car drive away after hearing voices outside the house. Timmothy described the car as a black Monte Carlo.

66.    Deering drove a blue Cadillac Eldorado.

67.    Timmothy told Wurtz he heard someone shout, "hurry up, hurry up." The voices Timmothy heard and the black Monte Carlo that Timmothy described were not mentioned in any police report. Wurtz, Miller, and Harvey concealed these facts from Deering and Oakland County prosecutors.

12

68.    In the second half of the recording, Timmothy also informed Wurtz that, on the day of the fire, he was working on his lawn equipment and brought gasoline inside the home; that his four-year-old sister tried to pick it up and dropped it, spilling gas in the hallway and living room; that he tried to clean it up with bleach and Lysol; that he previously got caught playing with matches; that his brother Michael previously got caught playing with matches; that he initially tried to extinguish the fire with a small cup of water; and that his mother and brother, Michael, were both smokers.

69.    None of the facts in the preceding paragraph were mentioned in any police narrative report. Wurtz, Miller, and Harvey hid them from Deering and Oakland County prosecutors.

70.    Wurtz, Miller, and Harvey knew that Timmothy had exculpated Deering, yet this information was not disclosed to the defense or the prosecution. The evidence was both exculpatory and material.

71.    Wurtz, Miller, Harvey, and the prosecution team also misled Deering about other matters. The Special Prosecutor found new evidence that each of the three jailhouse informants who testified against Deering received plea bargains, sentence reductions, or outright dismissal of charges in exchange for their testimony. None of that was disclosed to the defense or presented to the jury.

72.    The jury was materially misled about all three jail informant's

13

relationships with the Sheriff's Department and Prosecutor's Office, their motives, and their credibility.

### Informant Ralph McMorris

73.     More specifically, informant Ralph McMorris testified at Deering's trial that he had been in jail with Deering in 2003 and claimed that Deering confessed to him. Wurtz, Miller, Harvey, and Townsend placed McMorris in a cell with Deering to gather incriminating information.

74.     McMorris testified that he received no favors from law enforcement.

75.     Wurtz testified he didn't promise the jailhouse informants anything for their help; Wurtz denied they received promises of leniency or early release. Wurtz testified that the jailhouse informants had not asked him for any favors.

76.     In his closing argument, Townsend stated that "McMorris never received anything for his assistance."

77.     As Townsend, Wurtz, Miller, and Harvey knew, the Oakland County Sheriff's Department and Prosecutor's Office had a long-standing informant relationship with McMorris.

78.     For example, at the time of Deering's preliminary examination, McMorris was in custody in Genesee County, having been charged with stealing/possessing a fraudulent financial transaction device, M.C.L. § 750.157n. McMorris had eight prior felonies at that time, including assaultive crimes and fraud.

He was on parole and provided a fake name several times when arrested.

79.     After McMorris' preliminary examination on April 12, 2006, the Genesee County prosecutor's file stated: "PLEA AGREEMENT: NO." … "Plea to charge and HO3rd – 8 yr. If we have to bring victim back and make arrangements to do so – offer is off the table." These notes were made just days before McMorris testified at Deering's preliminary examination.

80.     Between the time of Deering's preliminary examination and trial, the Genesee County prosecutor moved to *Nolle Prosequi* McMorris' felony case.

81.     The only explanation of the dismissal was handwritten notes in the prosecutor's file stating, "D is jail house snitch in Oak Co case." Detective Wurtz's name and number are handwritten, including APA Townsend's name and two phone numbers. Also handwritten is the note, "Greg Townsend will show up for sentencing."

82.     During its investigation, the Michigan State Police obtained McMorris' parole records. Those records state: "3/06 the subject was arrested by Flint Twp PD and charged with Financial Transaction Device/Steal/Retain; however on 6/13/06 the charges were dropped with prejudice. It appears that the subject had information pertaining to a felony case in Pontiac and he was given a deal to testify in that case."

83.     Further evidence of the scheme between McMorris, Wurtz, Miller, Harvey, and Townsend is revealed in a two-page handwritten letter by McMorris to

Townsend, first discovered by the Oakland County Prosecutor's Office on April 16, 2021, during their review of Deering's wrongful conviction.

84.     The letter is dated April 7, 2006, and states, in pertinent part:

> "Dear Greg, I hope I did OK at the pre-exam Friday. I tried to keep my composure. Sorry if I screwed up my testimony…I'm due for court on Wed. 12th of April and as you know my charge <u>has</u> to be dismissed at this level or Im a cooked goose. Please do an off the record call to the station chief here or Tony on my behalf. Dave + Gary told me not to worry about it on Friday but I am a little...Even if they can P.F.I. the charge until a later date it gives me a chance to do some things for Lt. Green of the Geneesee County Sheriff Dept. Narc. Unit which we can use as a go between so there is no conflict… I've always fully trusted you and always will. Thanks – Ralph"

85.     In the letter, "Dave + Gary" refers to Defendants David Wurtz and Gary Miller, meaning those detectives had a conversation with McMorris on the day of Deering's preliminary examination about his Genesee County case that neither officer disclosed to Deering or included in their police narrative reports.

86.     Had McMorris' letter been disclosed, the defense would have been able to establish at trial that McMorris asked for Townsend, Wurtz, and Miller's assistance, and that his pending case in Genesee County had been dismissed after McMorris wrote the letter and before he testified at Deering's trial.

87.     In fact, Townsend used McMorris as a jailhouse informant since at least 1998, when McMorris testified for Townsend in another homicide trial as an informant. *See, People v. Washington*, No. 215249, 2001 WL 682475, at 2–3 (Mich.

Ct. App. Apr. 20, 2001) (describing McMorris' testimony as "suspect" where McMorris served time with the defendant in the Oakland County jail and testified that the defendant admitted his participation in the murder).

88.    McMorris wrote another letter to an assistant prosecuting attorney before Deering's trial that was not disclosed to the defense. The letter is dated April 10, 2004. In the letter, McMorris admits to being an informant for the Oakland County Homicide Task Force since 1995, includes a list of over 15 people he testified against, and contains a statement by McMorris regarding his own credibility in the Deering case. He writes: "With the exception of one time my credibility was unquestionable. And the one time I speak of is an attemp[t] to help put a guy away who killed five kids."

89.    In July 2012, McMorris admitted to a University of Michigan law student that he had been coerced, coached, and/or incentivized by Oakland County sheriff deputies into saying that Deering confessed to him. McMorris stated that Oakland County sheriff deputies would ask him things like "are you sure?" which indicated to him that he had given the wrong answer, compared to how officers wanted him to frame things.

90.    In his July 2012 interview, McMorris admitted being paid by law enforcement as "motivation" to testify in Deering's trial.

91.    McMorris has been a serial informant in felony cases out of Oakland

County. *See, People v. Holbrook*, No. 287383, 2010 WL 99010 at 8 (Mich. Ct. App. January 12, 2010); *People v. Washington*, No. 215249, 2001 WL 682475 at 3-4 (Mich. Ct. App. April 20, 2001); *People v. Lee*, No. 248427, 2004 WL 2914207 at 1 (Mich. Ct. App. December 14, 2004).

92.    The benefits McMorris received for testifying for Oakland County are extensive:

   a. In 1997, the Oakland County Sheriff's Department wrote a letter to an Oakland County prosecutor requesting "any assistance you can provide in the sentencing of Ralph McMorris." The detective stated that McMorris "supplied valuable info from his cell in OCJ" and could "give info on 2 or 3 unsolved homicides" if released;

   b. On March 14, 2004, McMorris bypassed his criminal defense attorney and wrote a letter directly to an Oakland County prosecutor requesting a plea deal in his pending criminal case. McMorris said he was an informant for Oakland County since 1996. McMorris claimed another prosecutor, "Beth," has met his daughter a couple of times;

   c. On April 2, 2004, APA Beth Hand wrote a letter to Judge Steven Andrews vouching for McMorris at his sentencing hearing. The prosecutor informed Judge Andrews that McMorris testified as an informant in numerous preliminary examinations and three circuit court jury trials and "received nominal amounts of money" for "his safety." The prosecutor asked the Judge to "please give it whatever weight you deem appropriate";

   d. On April 8, 2004, an assistant prosecuting attorney wrote a charge amendment memorandum documenting a plea agreement for McMorris. The stated basis for the plea bargain was that McMorris "gave considerable assistance in two cases." The memorandum included support letters from Hand and Townsend;

e.  In or around the year 2004, McMorris wrote another letter to an assistant prosecuting attorney asking for favors. McMorris identified the names of two witnesses from one of Townsend's cases that McMorris wanted protection from;

f.  On August 16, 2006, McMorris received a favorable plea deal shortly after Deering's trial, precisely due to his testimony against Deering;

g.  On or around March 27, 2007, an assistant prosecutor recommended in a letter to a supervisor that pending witness intimidation charges against McMorris should be dismissed. The prosecutor referenced a conversation he had with Townsend about McMorris. Townsend told the prosecutor about McMorris' cooperation in the Deering case, stating his testimony was very helpful in convicting Deering. McMorris' witness intimidation charges were subsequently dismissed;

h.  On January 19, 2009, McMorris wrote a letter to assistant prosecuting attorney Rob Novy, thanking Novy for the help he provided to McMorris;

i.  On July 22, 2011, McMorris' criminal defense attorney wrote a letter to Townsend asking to dismiss another criminal case, in part due to the testimony McMorris gave in the Deering case.

93.  Deering's jury never heard about the close, decades-long, ongoing relationship between the Prosecutor's Office and McMorris, and the relationship between Townsend and McMorris.

### Informant Phillip Turner

94.  Philip Turner was serving a sentence for Operating While Intoxicated – 3rd Offense in the Oakland County jail in July of 2000,

95.  At that time, Wurtz, Miller, Harvey, and Townsend intentionally placed

Turner in a cell with Deering to get information.

96.    Turner testified at trial that Deering told him he started the fire with lighter fluid that was on the porch. Turner denied receiving any benefit for testifying against Deering and denied working with detective Miller in prior cases.

97.    In truth, Turner had a close relationship with detective Miller. Turner testified multiple times in *People v. Jeffrey Nye* regarding a homicide in July 2001, and Miller was an officer in charge of the *Nye* case.

98.    The undisclosed, close relationship between Turner and Miller became evident to the Special Prosecutor years later.

99.    During her investigation, the Special Prosecutor learned that between the time of Deering's trial and sentencing hearing, Turner raped his 18-year-old neighbor. While Turner was being arrested for that offense, he became combative in his holding cell, yelled and kicked the steel door, and told an arresting officer to "fuck off" and contact his supervisor, Gary Miller.

100.   Turner was charged in Oakland County with three counts of Criminal Sexual Conduct 3rd degree and three counts of Criminal Sexual Conduct 4th degree. He was also charged with three counts of Uttering and Publishing in a separate case. An assistant prosecuting attorney from Macomb County was appointed due to a conflict of interest. The Petition for Appointment of a Special Prosecutor states, "Turner has testified as a prosecution witness during three prior unrelated felony

trials as a police informant."

101.   Turner was permitted to plead no contest to one significantly reduced count of Criminal Sexual Conduct. At sentencing, the Michigan Department of Corrections recommended a sentence of 19-40 years in prison. After Townsend approached the bench and spoke to the Judge, Turner was sentenced to five years.

102.   The prosecutor at sentencing stated: "there are special provisions in the Department of Corrections for individuals that have been of the assistance that Mr. Turner has, therefore I will make contact with them directly and make every arrangement to seek placement for him prior to his arrival...He was of some assistance to the prosecutor."

103.   Turner was used as an informant by Wurtz, Miller, and other police agencies on multiple occasions.

104.   Turner testified that he had never before received benefits for being an informant. His testimony was false. *See, People v. Fox,* 261972, 2006 WL 3826742 at 5 (Mich Ct App, Dec 28, 2006) (noting "the fact that Turner was being rewarded for testifying by having misdemeanor charges dismissed and being transferred away from Jackson Prison.")

105.   Turner testified in *Fox* on or before March 29, 2005, more than a year before Deering's trial.

106.   When he testified at Deering's trial, Turner had a long-standing

relationship with the Oakland County Sheriff's Department and Oakland County Prosecutor's Office. Turner continued to benefit from his testimony against Deering as late as 2019.

### Informant Raymond Jeffries

107.    Raymond Jeffries was incarcerated with Deering from August 2000 to September 2000.

108.    Jeffries testified that he talked to the police before being released from jail, though there is no police narrative of this conversation.

109.    One year later, on September 17, 2001, when in custody on a new offense, Jeffries gave Wurtz a handwritten statement claiming that Deering made inculpatory statements.

110.    Jeffries was in custody at that time for stealing car keys from a church pastor's coat pocket and taking the car from the church parking lot. There was a high-speed police chase of over 100 mph which ended when Jeffries crashed the stolen vehicle. Jeffries was a 4th habitual offender. The prosecutor's notes in the file state: "Cobb to 1 year in jail with 30 days credit, deviation based on def. assisting in multiple homicide/arson - OCSD/Royal Oak Twp Case."

111.    Detective Gary Miller's name and phone number appear on the inside of the file jacket in the lower right corner.

112.    Detective Miller was not involved in arresting Jeffries or investigating

his case.

113.   Jeffries was promised a sentence of 1 year in jail, which was approved by the officer in charge of the case.

114.   At sentencing, Jeffries had 13 prior felony convictions and three prior misdemeanors. He had served nine prior prison sentences and was under sentence for 2-15 years for probation violation and under sentence with the Michigan Department of Corrections. He also had an outstanding probation violation warrant in Wayne County. The Department of Corrections recommendation in the Presentence Investigation Report was 5-20 yrs.

115.   Jeffries received a sentence of 1 year in jail.

116.   Although Jeffries received a sentence deviation expressly based on his assistance in the Deering case, he testified that he received no benefit for his testimony at both the preliminary examination and trial. This benefit in the form of a significantly reduced sentence was not disclosed to the defense.

117.   The jury was affirmatively misled regarding Jeffries' prior relationship with and benefit from the Oakland County Sheriff's Department and the Oakland County Prosecutor's Office.

### Oakland County's practices, customs, and policies

118.   Since at least 1990, Oakland County had a pattern and practice of using informants to testify against others without disclosing the promised benefits to the

defense or jury, violating the United States Constitution as interpreted by *Brady v. Maryland,* 373 U.S. 83 (1963) and *Napue v. Illinois,* 360 U.S. 264 (1959).

119.   More specifically, informant Phillip Turner testified in *People v. Enfield*, No. 224369, 2002 WL 31160299, at 2 (Mich. Ct. App. Sept. 27, 2002). Turner acted as a 'jailhouse lawyer' for Enfield. Turner testified against Enfield by claiming Enfield asked Turner whether someone could 'beat' a polygraph test. *Id.* Oakland County detectives and prosecutors failed to disclose to Enfield's defense that Turner received benefits for his testimony.

120.   Turner also testified in *People v. Nye*, No. 252557, 2005 WL 862042, at 1 (Mich. Ct. App. Apr. 14, 2005). Defendants Wurtz, Miller, and Harvey were the officers in charge of that case. Wurtz asked Turner to go into a cell with Nye, a homicide suspect. *Nye v. Booker*, No. 06-15425, 2009 WL 2046486, at 11 (E.D. Mich. July 10, 2009). Nye allegedly confessed to Turner. At trial, Turner testified that he was not given any sort of deal or reward in exchange for his testimony. *Id.* at 11. Turner's testimony was false, and Oakland County detectives and prosecutors failed to disclose to Nye's defense that Turner received consideration for his testimony.

121.   *People v. Kyles*, No. 207355, 2000 WL 33418395, at 1 (Mich. Ct. App. June 13, 2000) involved a house fire in which an adult and three children died. Oakland County detectives claimed the fire was intentionally set by a drug dealer

with an accelerant and originated on the front porch. *Kyles v. Jackson*, No. 04-CV-71412, 2005 WL 2090887, at 1 (E.D. Mich. Aug. 26, 2005). A jailhouse informant, Keith Hollimon, testified against Kyles and claimed he saw Kyles start the fire.

122.   Townsend was the prosecutor assigned to Kyles' case. Townsend told jurors the only promise Hollimon received was investigators would do their best to keep him and his family safe. Kyles was subsequently convicted of four counts of second-degree murder.

123.   The fire, however, was accidental, most likely caused by an improperly rewired cord on a space heater. And Hollimon, the jailhouse informant who testified against Kyles, has recanted his testimony. In truth, Hollimon was not at the scene of the fire, did not know how the fire started, and Oakland County detectives promised to help reduce Hollimon's sentence in a home invasion case he was facing. Oakland County detectives and prosecutors failed to disclose to Kyles' defense that Hollimon received a quid pro quo for his testimony.

124.   Defendants Miller and Harvey were also involved in the investigation and false arrest of Craig Wrubel in September 1999. Judge Feikens described their investigation as "incompetent and unprofessional," *Wrubel v. Bouchard*, 173 F. Supp. 2d 716, 725 (E.D. Mich. 2001), concluding it "was a clearly bungled investigation in which the defendants erroneously and unreasonably focused their efforts on the wrong man." *Id.* at 723.

125. According to the district court, the Oakland County "sheriff's department never analyzed the evidence that Wrubel presented to clear his name. Defendants were so eager to crack this high-profile case that they never … follow[ed] the necessary protocols." *Wrubel v. Bouchard,* 200 F. Supp. 2d 762, 770 (E.D. Mich. 2002), rev'd, 65 F. App'x 933 (6th Cir. 2003).

126. Oakland County investigators, including Harvey, "should have stopped and questioned their evidence. Instead, they ignored this uncontroverted physical evidence and arrested him." *Wrubel v. Bouchard*, 200 F. Supp. 2d at 768.

127. In *Wrubel*, Judge Feikens granted plaintiff's motion for summary judgment, finding there was no question that Miller and Harvey violated Wrubel's constitutional rights. *Id.* at 770.

128. Although the Sixth Circuit Court of Appeals reversed the district court's order granting summary judgment to Wrubel, Oakland County was on notice that investigators may not rely on informants indiscriminately while ignoring and concealing exculpatory evidence.

129. Oakland County bears responsibility for adequately conveying what *Brady* and *Napue* require and monitoring staff compliance.

130. On and before March 3, 2006, the date of Deering's arrest, Oakland County had a custom and practice of authorizing, condoning, tolerating and approving illegal and unconstitutional actions by Oakland County Sheriff Deputies

26

and members of its Major Crimes Taskforce.

131.    Oakland County's unconstitutional customs and practices included but were not limited to:

a.    Maintaining an affirmative policy and practice of requiring investigators and detectives to keep secret the use of informants and/or their offers of leniency, in violation of the Due Process Clause of the 14th Amendment to the United States Constitution.

b.    Conducting inadequate investigations into serious felony cases such as arson, rape, and murder, to close cases, and affirmatively choosing not to develop or pursue actual leads or evidence;

c.    Knowingly and deliberately fabricating evidence to manufacture probable cause to arrest and/or strengthen a case for conviction;

d.    Knowingly tolerating *Brady* violations committed by investigators to improve conviction rates on felony cases;

e.    Knowingly and deliberately using jailhouse informants to testify against criminal defendants in exchange for leniency, without disclosing those promises or expectations of benefits to those defendants in violation of *Napue v. Illinois*;

f.    Failing to have policies and procedures in place, and/or by failing to adequately supervise or train employees in accordance with said policies and procedures, and/or by failing to attend to such policies and procedures to ensure informants are appropriately tracked, monitored, and their incentives disclosed to criminal defendants; and,

g.    Failing to have policies and procedures in place, and/or by failing to supervise or train employees per said policies and procedures, and/or by failing to attend to such policies and procedures to ensure that exculpatory and impeachment evidence is provided to prosecutors and defense attorneys to prevent wrongful convictions.

132.   Oakland County, through its final policymakers, further maintained a custom and policy of failing to adequately train, supervise, and/or discipline officers concerning proper and constitutionally adequate evidence collection, analysis, and disclosure, including their duty not to fabricate evidence and to disclose apparent exculpatory and impeachment evidence.

133.   Oakland County's customs and policies, set forth above, demonstrated deliberate indifference to the constitutional rights of its citizens, including Deering, and were the moving force behind the constitutional violations.

134.   On May 15, 2021, and after reviewing the misconduct in this case, the Oakland County Prosecutor stated that "fairness and transparency are paramount. We must always do the right thing even if it exposes our own office, even when it's not easy. If evidence exists that calls into question the credibility of a witness, we are ethically obligated to disclose it. I am committed to doing that in this case and in every case."

135.   As a result of Deering's wrongful conviction, the Oakland County Prosecutor ordered mandatory training for every assistant prosecutor. However, the Oakland County Sheriff's Department has not modified its training regimen.

136.   On September 2, 2021, the Oakland County Prosecutor filed a joint motion with Deering to vacate his convictions and sentences, stating, in part: "Because there were multiple, significant constitutional violations, relief from

judgment is required under the law. … Considering the evidence collectively it is painfully clear that the result of the trial would likely have been different had the suppressed evidence been disclosed to the defense."

137.  An order granting the joint motion to vacate Deering's convictions was entered on September 21, 2021.

138.  The Prosecutor's motion for *nolle prosequi* was granted on September 30, 2021, and Deering was released from custody.

139.  Due to the Defendants' conduct, Deering suffered the following injuries and damages:

a.  Suffering a deprivation of liberty by being wrongfully incarcerated and imprisoned for over fifteen years;

b.  Severe emotional distress beginning shortly after the fire, through his arrest to the present, including, but not limited to: the emotional distress of being investigated and charged with five counts of arson and murder, facing a sentence of life in prison without parole; and being wrongfully convicted of crimes the Defendants knew he did not commit;

c.  Physical manifestations of emotional distress including, but not limited to, sleeplessness, irritability, loss of appetite, headaches, and other symptoms;

d.  Fright, shock, indignity, humiliation, outrage, and embarrassment of being wrongfully charged and imprisoned for murdering children;

e.  Loss of enjoyment of daily activities including, but not limited to, seeing his children and grandchildren grow up;

f.  Not being able to attend funerals of friends and family members;

g.   Physical injuries suffered in prison, including being assaulted;

h.   Loss of employment opportunity, past income and future earning capacity;

i.   Loss of his close relationships with his minor daughters;

j.   Loss of employment opportunity, past income and future earning capacity;

k.   Restricted and/or complete loss of all forms of personal freedom and physical liberty, including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, personal fulfillment, sexual activity, family relations, recreational activities, and personal expression; and,

l.   Other damages identified during discovery and available under the law.

## **COUNT I**

### ***Brady* Violations**

**Against Wurtz, Miller, and Harvey**
**In Violation of the Fourteenth Amendment,**
**Cognizable Under 42 U.S.C. § 1983**

140.   Plaintiff restates and realleges the allegations contained in the above paragraphs as though fully set forth herein.

141.   The Due Process Clause of the Fourteenth Amendment provides that no state may "deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

142.    Suppression of material evidence favorable to the accused violates due process, irrespective of the good faith or bad faith of the prosecution. *Brady v. Maryland,* 373 U.S. 83, S. Ct. 1194 (1963).

143.    Wurtz, Miller, and Harvey withheld the following exculpatory or impeachment evidence:

    a.    The second half of Timmothy Dean's April 19, 2000, videotaped interview wherein Timmothy said that "Juwan" and "Little Juwan" are two different people;

    b.    A photo lineup including Deering's photograph, and Timmothy's explicit statement that Deering's voice is not the voice he heard that night and that "I'm sure it's not him";

    c.    Timmothy was working on his lawn equipment the day of the fire, brought a gasoline container into the home, and his four-year-old sister spilled it in the hallway and living room;

    d.    Timmothy previously got caught playing with matches;

    e.    Michael Dean previously got caught playing with matches;

    f.    Timmothy tried to extinguish the fire with a small cup of water;

    g.    Marie Dean and Michael Dean were both smokers;

    h.    A diagram Timmothy referenced depicting the location of the gas container close to where the fire started;

    i.    McMorris received money, benefits, and/or leniency from Oakland County for testifying against Deering, though McMorris, Wurtz, and Townsend told the jury that McMorris never received anything for his assistance;

    j.    Turner knew and worked with Miller as an informant in the past, and received benefits and leniency for doing so, though he told

Deering's jury that he did not receive any benefits;

k.      Jeffries received a sentence deviation for his anticipated testimony in the Deering case, though he testified at both the preliminary examination and trial that he received no benefit for his testimony; and,

l.      Other material to be learned during discovery.

144.   Wurtz, Miller, and Harvey knowingly violated their duty to disclose to prosecutors all material evidence and its exculpatory and impeachment value were apparent.

145.   The material identified above was favorable to Deering, either because it was exculpatory or impeaching; it was suppressed by Wurtz, Miller, and Harvey, since the investigators failed to mention the evidence in their police narrative reports, much less identify the names of several witnesses whose testimony would have been favorable to Deering; the evidence was suppressed by Wurtz, Miller, and Harvey either willfully or inadvertently; and prejudice ensued because there is a reasonable probability that the suppressed evidence would have produced a different verdict.

146.   The *Brady* violations committed by Wurtz, Miller, and Harvey resulted in Deering not receiving a fair trial, described as a trial resulting in a verdict worthy of confidence.

147.   Had Wurtz, Miller, and Harvey disclosed the *Brady* material, there would have been no arrest, much less a conviction.

148.   A re-trial that included the *Brady* evidence would result in a directed

verdict or acquittal.

149.   The *Brady* evidence cited above would have been apparent to any reasonable officer acting in good faith.

150.   Deering's right to be provided with material exculpatory and impeachment evidence was clearly established long before Deering was investigated and arrested.

WHEREFORE, Plaintiff requests the following relief:

a.   Compensatory non-economic and economic damages in excess of $75,000.00 including, but not limited to, all damages recoverable under the United States Constitution and/or 42 U.S.C. § 1983 and/or the laws of the State of Michigan;

b.   Punitive damages;

c.   Reasonable attorney fees under 42 U.S.C. § 1988, costs, and interest; and,

d.   Such other and further relief as appears reasonable and just under the circumstances.

## COUNT II

### Fabrication of Evidence

**Against Wurtz, Miller, Harvey, and Townsend,**
**In Violation of the Fourteenth Amendment,**
**Cognizable Under 42 U.S.C. § 1983**

151.   Plaintiff restates and realleges the allegations contained in the above paragraphs as though fully set forth herein.

152.   The Due Process Clause of the Fourteenth Amendment is violated when

evidence is knowingly fabricated and a reasonable likelihood exists that the false

evidence would have affected the decision of the jury.

153.   Defendants Wurtz, Miller, Harvey, and Townsend violated Deering's

Fourteenth Amendment right and deliberately fabricated false testimony and other

evidence in the following ways:

a.   Intentionally placing jailhouse informants in Deering's cell after their warrant request was denied to manufacture faux admissions from Deering;

b.   Procuring false testimony from McMorris by corruptly asking McMorris "are you sure?" which overtly telegraphed to McMorris that investigators wanted different facts to support their arson narrative;

c.   Concealing promises of leniency to the jailhouse informants in exchange for their testimony by, among other ways, using inconspicuous hand gestures to get them to stop talking about those promises during their video-recorded interviews, interviews that would have been viewed by, had they been disclosed to, the defense and jury;

d.   Circulating newspaper articles in the jail about the arson investigation, thereby giving the jailhouse informants knowledge of police theories such as lighter fluid being used on the porch to ignite the fire, before the informants spoke to Deering to secure manufactured admissions from him;

e.   Townsend's traveling to Genesee County before Deering's trial to incentivize McMorris to give false testimony at Deering's trial by advocating for dismissal of McMorris' criminal charges, in a functional capacity more akin to a criminal defense attorney and investigator rather than an Oakland County prosecutor;

f.   Intentionally deleting the beginning portion of the in-car video recording from the patrol vehicle of the first deputy to have

34

> arrived on the scene, which depicted the beginning stage of the fire inside the home and not on the porch; and,

g.      Other fabrications to be developed during discovery.

154.   Wurtz, Miller, Harvey, and Townsend knowingly fabricated the above-referenced evidence and a reasonable likelihood exists that the false evidence would have affected the decision of the jury.

155.   Wurtz, Miller, Harvey, and Townsend deliberately fabricated the above-referenced evidence to criminally charge, arrest, prosecute, detain, and convict Deering.

156.   These Defendants continued their investigation despite the fact that they knew Deering was innocent or were deliberately indifferent to Deering's innocence, and the results of the investigation were used to criminally charge, arrest, prosecute, detain, and convict Deering.

157.   These Defendants used investigative techniques so coercive and abusive that they knew, or were deliberately indifferent, that those techniques would yield false information used to criminally charge, arrest, prosecute, detain, and convict Deering.

158.   At all times relevant, it was clearly established that the Fourteenth Amendment right to due process prohibits a knowing and deliberate use by investigators of perjured evidence in order to obtain a conviction.

WHEREFORE, Plaintiff requests the following relief:

a.      Compensatory non-economic and economic damages in excess of $75,000.00 including, but not limited to, all damages recoverable under the United States Constitution and/or 42 U.S.C. § 1983 and/or the laws of the State of Michigan;

b.      Punitive damages;

c.      Reasonable attorney fees under 42 U.S.C. § 1988, costs, and interest; and,

d.      Such other and further relief as appears reasonable and just under the circumstances.

## COUNT III

### Conspiracy to Interfere with Civil Rights

**Against Wurtz, Miller, Harvey, Townsend, McMorris, Turner, and Jeffries, In Violation of the Fourteenth Amendment, Cognizable Under 42 U.S.C. §§ 1983 and 1985**

159.   Plaintiff restates and realleges the allegations contained in the above paragraphs as though fully set forth herein.

160.   42 U.S.C. § 1985 provides, in pertinent part:

If two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property …, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators. 42 U.S.C. § 1985(2), (3).

161.   The knowing use of materially false testimony, or the knowing failure to correct materially false testimony, violates the Due Process clause of the

Fourteenth Amendment.

162.   False testimony is "material" if there is any reasonable likelihood that it could have affected the judgment.

163.   The Defendants conspired to deprive Deering of his right to Due Process, committed overt acts in furtherance of the conspiracy, and injured Deering as a result.

164.   The Defendants had a plan to fabricate and withhold evidence; the Defendants shared a conspiratorial objective to deprive Deering of his constitutional rights; and overt acts were committed in furtherance of the conspiracy that caused Deering's injuries.

165.   Detectives Wurtz, Miller, Harvey, McMorris, Turner, and Jeffries planned to withhold information from prosecutors and Deering's defense attorney for the purpose of obstructing justice and convicting Deering.

166.   As explained throughout this Complaint, the jailhouse informants agreed with the detectives to testify against Deering without telling Deering or the jury about the benefits they received for doing so.

167.   The jailhouse informants received money, plea agreements, and sentence reductions for testifying against Deering and assisting in the investigation of Deering.

168.   More specifically, the agreements to deprive Deering of his

37

constitutional rights and the overt acts committed in furtherance of those agreements

include, but are not limited to, the following:

a. On or before April 6, 2006, the date of Deering's preliminary examination, Wurtz and Miller promised McMorris that if he testified against Deering, they would help McMorris with the charges he was facing in Genesee County. After McMorris testified against Deering at the preliminary examination, the Genesee County prosecutor's office dismissed McMorris' felony charges. Wurtz, Miller, and Townsend encouraged the Genesee County prosecutor's office to dismiss McMorris' charges because McMorris agreed to testify against Deering. At Deering's trial, both McMorris and Wurtz falsely testified that McMorris received no benefits or offers of leniency for his testimony. The men agreed not to disclose their plan to Deering, his counsel, or the jury.

b. In July 2012, McMorris admitted that detectives gave him money and coached him into saying that Deering confessed. McMorris stated that the Defendants would ask him things like "are you sure?" which indicated to him that he had given the wrong answer, compared to how officers wanted him to frame things. The men agreed not to disclose this scheme to Deering, his counsel, or the jury.

c. On or around July 21 through July 29, 2000, Turner agreed with Wurtz, Miller, and Harvey to be placed in a cell with Deering to obtain fabricated admissions from Deering. At Deering's trial, Wurtz testified that Turner did not receive any promises of leniency. Similarly, Turner testified that he was an informant three times, and he never received benefits for being one. In truth, Turner testified in *People v. Fox,* 261972, 2006 WL 3826742 at 5 (Mich Ct App, Dec 28, 2006), and Turner was rewarded for testifying against Fox by having misdemeanor charges dismissed. Both Wurtz and Turner submitted false testimony at Deering's trial. Neither Wurtz, Turner, nor Harvey disclosed their scheme to Deering, his counsel, or the jury.

d. Between August 2000, and September 17, 2001, Jeffries agreed

with Wurtz, Miller, and Harvey to obtain fabricated admissions from Deering while housed together in the Oakland County jail. Around that time, charges were pending against Jeffries for stealing a car from a church pastor, leading the police on a high-speed chase, and crashing the stolen vehicle. Wurtz, Miller, and Harvey enticed Jeffries to obtain faux admissions from Deering by promising to help him with a sentence reduction. On February 19, 2002, Miller encouraged an assistant prosecuting attorney to give Jeffries a sentence reduction "based on [Jeffries'] assistance" in Deering's case and others. At Deering's trial, both Jeffries and Wurtz denied that Jeffries received any benefits. Their scheme was not disclosed to Deering, his counsel, or the jury.

169. McMorris, Turner, and Jeffries agreed to testify against Deering, understanding that their consideration for doing so would not be disclosed to Deering or the jury.

170. The corrupt agreements to conceal the terms of the jailhouse informants' benefits and promises and thereafter allow the informants to submit false testimony about those assurances violated Deering's constitutional rights.

171. Defendants knew that the preliminary examination and/or trial testimony of Wurtz, McMorris, Turner, and Jeffries was false.

172. The preliminary examination and/or trial testimony of Wurtz, McMorris, Turner, and Jeffries was material because there is a reasonable likelihood that it could have affected the results of both proceedings.

173. Had the jury been apprised of the true facts, it would have concluded that Wurtz testified falsely, and McMorris, Turner, and Jeffries fabricated their

testimony and were incentivized to do so.

174.   Had the jury been apprised of the truth, it would have concluded that Townsend's opening and closing statements that the jailhouse informants did not receive consideration for their testimony were false.

175.   Revealing the truth to the jury would have resulted in Deering's acquittal.

176.   Defendants' use of false evidence violated Deering's right to Due Process.

177.   Wurtz, Miller, and Harvey engaged in other overt acts in furtherance of their conspiracy. These Defendants incentivized other witnesses with promises of leniency and money in exchange for information about Deering, while corruptly withholding exculpatory and impeachment evidence that the witnesses provided them. For example:

   a.   Wurtz and Miller interviewed Pompey Davis on April 10, 2000. During the interview, these detectives implied that Deering might have started the fire, but Davis denied that Deering would have done so, stating that Deering and Oliver Dean were friends. Attempting to encourage Davis to name Deering as the arsonist, Miller told Davis that "what the three of us talk about in here is confidential." This conversation was not detailed in any police narrative report, and the video-recorded interview was not disclosed to the prosecutor, Deering, or Deering's counsel.

   b.   Wurtz and Miller interviewed B. Pruitt on April 10, 2000. Miller told Pruitt that he received a tip from the FBI that Pruitt was responsible for starting the fire. Pruitt denied starting the fire, and denied that Deering would have started the fire, stating that

Deering is "not a threatening guy." Miller enticed Pruitt to name Deering as the arsonist by telling Pruitt "we should look at you for doing it", but if Pruitt told him who started the fire it would "all be anonymous. No one has to know where we get our information." Wurtz told Pruitt he contacted the district court about his domestic violence case, stating, "you're all good." Pruitt asked the detectives if they could help with his probation violation. The detectives told Pruitt they "were going to make some calls" on his behalf. These statements were not detailed in any police narrative report, and the video-recorded interview was not disclosed to the prosecutor, Deering, or Deering's counsel.

c.  Wurtz and Miller interviewed Delano Rustin on April 10, 2000. After pressing Rustin to identify Deering as the person who started the fire, Miller told Rustin he was "going to put you in a position you haven't been in before." Miller stated he would "keep it confidential", and "we can pay you a whole ton of money. … The money is out there … . This is what we do." After Miller reassured Rustin that his name "ain't coming up", Rustin asked what are "you guys going to do for me for all this information?" Miller responded, "If it's good?" Rustin then provided the names of other individuals who he believed started the fire. This conversation was not detailed in any police narrative report, and the video-recorded interview was not disclosed to the prosecutor, Deering, or Deering's counsel.

d.  Wurtz and Miller interviewed Rapalla Frame on April 17, 2000. Frame told the detectives that gasoline spilled near the front door, that he caught the children playing with matches, and that the wires on the doorbell created sparks that the children often played with. Frame also told the men that Oliver Dean said he would burn the house down. These statements were not included in any police narrative report, and the video-recorded interview of Frame was not disclosed to the prosecutor, Deering, or Deering's defense attorney.

e.  Wurtz and Miller interviewed Mario Jones on May 11, 2000. Miller immediately told Jones that "this is off the record, this is between you and I." After asking questions about Deering, Jones denied that Deering had a propensity for violence. Jones asked

41

the detectives if they could help him with his pending criminal case, and while Wurtz responded that he didn't "have any control over that my friend", the recording of the interview shut off prematurely before the interview ended. Detectives did not include this conversation in any police narrative report, and the video-recorded interview was not disclosed to the prosecutor, Deering, or Deering's attorney.

f.   Sgt. Miles and an unknown detective interviewed Tahara Hawk on March 12, 2003.  The detectives pressed Hawk to tell them who started the fire. Hawk was reluctant to provide information, so Miles assured Hawk that "We control [the information that] gets out. It's just going to be certain people." Hawk then informed the detectives that Melody Hurst twice admitted that she started the fire. Thereafter, Miles stated, "Let me tell you something. Between the three of us in this room. [Deering] sat here and cried like a fucking baby. That little patsy ass is all he is."  Miles then told Hawk he was going to get a warrant for Deering, and Deering was "never to be released again." Miles reassured Hawk that any information she gave the detectives "stays right here. We are going to control the information that gets out." Detectives exited the interview room but left their paperwork from their case file for Hawk to read. Detectives did not include these details in any police narrative report, and Hawk's video-recorded interview was not disclosed to the prosecutor, Deering, or Deering's attorney.

178.   Defendants conspired to obstruct the due course of justice in violation of 42 U.S.C. § 1985(2), deny Deering equal protection of the laws in violation of section 1985(3), and deprive Deering under color of state law of rights, privileges, and immunities secured by the Constitution and laws in violation of section 1983.

WHEREFORE, Plaintiff requests the following relief:

a.   Compensatory non-economic and economic damages in excess of $75,000.00 including, but not limited to, all damages recoverable under the United States Constitution and/or 42

U.S.C. § 1983 and/or the laws of the State of Michigan;

b.      Punitive damages;

c.      Reasonable attorney fees under 42 U.S.C. § 1988, costs, and interest; and,

d.      Such other and further relief as appears reasonable and just under the circumstances.

## COUNT IV

### Wrongful Institution of Legal Process – Malicious Prosecution

**Against Wurtz, Miller, and Harvey,
In Violation of the Fourth Amendment,
Cognizable Under 42 U.S.C. § 1983**

179.   Plaintiff restates and realleges the allegations contained in the above paragraphs as though fully set forth herein.

180.   Deering had a constitutional right, guaranteed by the Fourth Amendment, to be free of illegal seizure and detention without probable cause, based on false statements and/or material omissions that were knowingly or recklessly made to manufacture probable cause.

181.   Defendants Wurtz, Miller, and Harvey, as officers in charge of the investigation, were under constitutional duties to make truthful statements to the prosecutor and district court judge to establish probable cause for an arrest warrant.

182.   These Defendants influenced or participated in the initiation of Deering's criminal prosecution by deliberately and knowingly supplying false

information and omitting material information which showed a reckless disregard for the truth in requesting an arrest warrant, swearing to facts in support of probable cause, and/or lying at the preliminary examination, which were material to a finding of probable cause.

183. Wurtz, Miller, and Harvey's false statements and material omissions included:

a.   Not telling the prosecutor or Judge that Timmothy Dean said that "Juwan" and "Little Juwan" are two different people;

b.   Not telling the prosecutor or Judge that Timmothy looked at a photograph of Deering and explicitly stated that Deering's voice is not the voice he heard that night and that "I'm sure it's not him";

c.   Not telling the prosecutor or Judge that there was evidence the fire was accidental, such as Timmothy's video-recorded statement that gasoline spilled inside the home on the day of the fire and children living inside the home played with matches;

d.   Not telling the prosecutor or Judge about a diagram that Timmothy used to pinpoint where the fire started and the location of the gasoline container;

e.   Not telling the prosecutor or Judge that Timmothy saw a black Monte Carlo drive away from the house soon after the fire started, though detectives knew Deering drove a blue Cadillac Eldorado; and,

f.   Other false statements and material omissions to be learned during discovery.

184. Through the false statements and material omissions identified above, and by concocting the false narrative that the fire was deliberately started, Wurtz,

Miller, and Harvey caused Deering to be falsely arrested, maliciously prosecuted, convicted and incarcerated, in violation of his constitutional rights.

185.   At all times relevant, Deering's right not to be seized and continuously detained without probable cause, based upon a police officer's deliberate and knowing fabrication of evidence and false statements and material omissions to prosecutors and magistrate judges was clearly established before Deering was arrested.

WHEREFORE, Plaintiff requests the following relief:

   a.   Compensatory non-economic and economic damages in excess of $75,000.00 including, but not limited to, all damages recoverable under the United States Constitution and/or 42 U.S.C. § 1983 and/or the laws of the State of Michigan;

   b.   Punitive damages;

   c.   Reasonable attorney fees under 42 U.S.C. § 1988, costs, and interest; and,

   d.   Such other and further relief as appears reasonable and just under the circumstances.

## COUNT V

### Continued Detention without Probable Cause

**Against Wurtz, Miller, and Harvey,
In Violation of the Fourth Amendment,
Cognizable Under 42 U.S.C. § 1983**

186.   Plaintiff restates and realleges the allegations contained in the above paragraphs as though fully set forth herein.

187.   Deering had a constitutional right, guaranteed by the Fourth Amendment, to be free of continued detention without probable cause.

188.   As investigative officials, Wurtz, Miller, and Harvey had duties to refrain from engaging in acts that continued Deering's detention without probable cause.

189.   At all times relevant, Wurtz, Miller, and Harvey perpetuated Deering's continued detention when it was in their power to dissolve probable cause.

190.   Wurtz, Miller, and Harvey knew that the evidence used to detain Deering was fabricated.

191.   Beginning March 3, 2006, Deering's detention was unlawfully continued due to Wurtz, Miller, and Harvey's failure to disclose the exculpatory and impeachment evidence identified above and Deering's right to a fair trial was abridged.

192.   Had these Defendants not fabricated inculpatory information in the form of the false testimony of the jailhouse informants or by concealing and editing video recordings of witnesses, there would have been no probable cause for Deering's continued detention.

193.   Had Wurtz, Miller, and Harvey not unlawfully suppressed the exculpatory portion of Timmothy Dean's video-recorded interview, among other exculpatory information identified above, probable cause for Deering's continued

detention would have been eliminated.

194.    Wurtz, Miller, and Harvey also knew of and failed to disclose facts from which the jury could have inferred that the fire was an accident. Had this information been made known, probable cause for Deering's continued detention would have dissolved.

195.    At all times relevant, these Defendants influenced or participated in Deering's detention by deliberately and knowingly supplying false information and omitting material information which showed a reckless disregard for the truth.

196.    Through the false statements and material omissions identified above, Wurtz, Miller, and Harvey caused Deering to be continuously detained, day by day and year by year, from March 3, 2006, to September 30, 2021.

197.    At all times relevant, Deering's right to be free of continued detention without probable cause was clearly established long before March 3, 2006.

WHEREFORE, Plaintiff requests the following relief:

  a.    Compensatory non-economic and economic damages in excess of $75,000.00 including, but not limited to, all damages recoverable under the United States Constitution and/or 42 U.S.C. § 1983 and/or the laws of the State of Michigan;

  b.    Punitive damages;

  c.    Reasonable attorney fees under 42 U.S.C. § 1988, costs, and interest; and,

  d.    Such other and further relief as appears reasonable and just under the circumstances.

## COUNT VI

### Affirmative Policies, Customs, and Practices – *Monell* violation

**Against Oakland County**
**In Violation of the Fourth and Fourteenth Amendments,**
**Cognizable Under 42 U.S.C. § 1983**

198.   Plaintiff restates and realleges the allegations contained in the above paragraphs as though fully set forth herein.

199.   As pled throughout this Complaint, Oakland County, by and through its Major Crimes Taskforce, implemented an investigatory practice since at least 1990 of using informants to testify against others while concealing the promised benefits from the defense or jury, violating the United States Constitution as interpreted by *Brady v. Maryland,* 373 U.S. 83 (1963) and *Napue v. Illinois,* 360 U.S. 264 (1959).

200.   Oakland County's 30-year pattern and practice of using informants without disclosing the promises, inducements, or benefits amounts to an unconstitutional *de facto* policy.

201.   By and through its policymakers and agents of the Major Crimes Task Force, Oakland County maintained an express policy that violated clearly established law under *Brady* or *Napue.*

202.   Deering's wrongful conviction and imprisonment were caused by Oakland County's affirmative custom or policy of requiring investigators and

detectives to keep their use of informants secret and withhold evidence that would have cleared Deering.

203.   Oakland County's policy of using informants in violation of *Brady* and *Napue* was the moving force of Deering's charges, detention, and wrongful conviction.

204.   As a direct and proximate result of Oakland County's policies and practices and willful violation of Deering's constitutionally protected rights, Deering was detained without probable cause, charged with crimes he did not commit, deprived of his liberty, and wrongfully convicted and imprisoned for over 15 years, causing him to suffer the injuries and damages set forth above.

WHEREFORE, Plaintiff requests the following relief:

    a.    Compensatory non-economic and economic damages in excess of $75,000.00 including, but not limited to, all damages recoverable under the United States Constitution and/or 42 U.S.C. § 1983 and/or the laws of the State of Michigan;

    b.    Punitive damages;

    c.    Reasonable attorney fees under 42 U.S.C. § 1988, costs, and interest; and,

    d.    Such other and further relief as appears reasonable and just under the circumstances.

## COUNT VII

## Failure to Train – *Monell* violation

**Against Oakland County
In Violation of the Fourth and Fourteenth Amendments,
Cognizable Under 42 U.S.C. § 1983**

205.   Plaintiff restates and realleges the allegations contained in the above paragraphs as though fully set forth herein.

206.   Oakland County may be liable under section 1983 for constitutional violations arising from its failure to train its employees properly.

207.   At all times relevant, Oakland County was on actual or constructive notice that its Major Crimes Task Force relied on informants while concealing and withholding exculpatory evidence.

208.   Oakland County foresaw, or should have foreseen, or was placed on actual or constructive notice that people were being arrested for and convicted of crimes they did not commit.

209.   At all times relevant, Oakland County failed to train investigators, including Wurtz, Miller, and Harvey, of their constitutional obligations to disclose and produce exculpatory and impeachment evidence to criminal defendants, including but not limited to plea bargains, promises of leniency, sentence reductions, and other benefits given to informants in exchange for their testimony.

210.   For years, Oakland County tolerated constitutional violations under

*Brady* and *Napue* which enabled its Major Crimes Task Force to arrest and convict Deering and others in violation of their constitutional rights.

211.   The failure of Oakland County to provide adequate training and supervision to investigators on the Major Crimes Task Force is shown through a pattern of similar constitutional violations by officers in the Sheriff's Department and its adherence to an approach that it knew failed to prevent tortious conduct by officers, or in the alternative, failed to train its employees to handle recurring situations presenting an obvious potential for a constitutional violation.

212.   The failure of Oakland County to implement different or additional training for Wurtz, Miller, and Harvey was so apparent that its failure to do so is properly characterized as deliberate indifference to Deering's constitutional rights.

213.   The failure of Oakland County to adequately train Wurtz, Miller, and Harvey was the moving force of Deering's arrest and wrongful conviction.

214.   As a direct and proximate result of Oakland County's failure to train and deliberate indifference, Deering was charged with crimes he did not commit, deprived of his liberty, and wrongfully convicted and imprisoned for over 15 years, causing him to suffer the injuries and damages set forth above.

WHEREFORE, Plaintiff requests the following relief:

   a.   Compensatory non-economic and economic damages in excess of $75,000.00 including, but not limited to, all damages recoverable under the United States Constitution and/or 42 U.S.C. § 1983 and/or the laws of the State of Michigan;

b.  Punitive damages;

c.  Reasonable attorney fees under 42 U.S.C. § 1988, costs, and interest; and,

d.  Such other and further relief as appears reasonable and just under the circumstances.

## DEMAND FOR TRIAL BY JURY

NOW COMES Plaintiff, by and through his counsel and hereby demands a trial by jury as to all those issues so triable as of right.

Respectfully submitted,

**GARRISON LAW, PC**

Dated:  August 4, 2022                    /s/ *Trevor B. Garrison*
                                          TREVOR B. GARRISON (P69255)
                                          Attorney for Plaintiff
                                          1523 N. Main St.
                                          Royal Oak, MI 48067
                                          (248) 847-1000
                                          tgarrison@garrison-law.com

**LAW OFFICE OF MICHAEL R. DEZSI, PLLC**

Michael R. Dezsi (P64530)
1523 N. Main St.
Attorney for Plaintiff
1523 N. Main St.
Royal Oak, MI 48067
(313) 757-8112
mdezsi@dezsilaw.com