UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JUWAN DEERING et al.,

       Plaintiffs,

                                Case No. 22-cv-11809

v.

                                HON. MARK A. GOLDSMITH

OAKLAND COUNTY et al.,

       Defendants.

_____/

## OPINION & ORDER
### (1) DENYING DEERING'S MOTION FOR SUMMARY JUDGMENT (Dkt. 138); (2) GRANTING TOWNSEND'S MOTION FOR SUMMARY JUDGMENT (Dkt. 136); AND (3) GRANTING IN PART DETECTIVES' MOTION FOR SUMMARY JUDGMENT (Dkt. 145)

Plaintiff Juwan Deering filed this 42 U.S.C. § 1983 and § 1988 claim stemming from his vacated felony murder conviction, alleging that the underlying prosecution and investigation violated his constitutional rights. Deering brings suit against (i) Detectives David Wurtz, Gary Miller, and William Harvey ("Detectives"); (ii) fire and arson investigator James Lehtola; (iii) jailhouse informants Ralph McMorris, Phillip Turner, and Raymond Jeffries; and (iv) prosecutor Gregory Townsend. Specifically, Deering alleges that the Detectives and Lehtola withheld exculpatory evidence from Deering in violation of Brady (Count I), conspired to maliciously prosecute Deering in violation of the Fourth Amendment and state law (Counts IV, VIII), and perpetuated Deering's detention in the absence of probable cause in violation of the Fourth Amendment (Count V). Am. Compl. at PageID.634–638, 650–655, 660–662 (Dkt. 56). Deering also alleges that the Detectives, Lehtola, and Townsend fabricated testimony and evidence and

1

conspired to deprive Deering of his due process rights in violation of the Fourth and Fourteenth Amendments (Counts II, III).  Id. at PageID.638–650.[1]

The parties now move for summary judgment on these claims.  Deering moves for summary judgment on his Brady violation claim against the Detectives, arguing that there is no genuine dispute of material fact that the Detectives withheld favorable evidence from Deering.  Pl. Mot. at PageID.4210–4217 (Dkt. 138).  Townsend moves for summary judgment on Counts II and III on the grounds that no material evidence supports Deering's claim that Townsend was involved in fabricating evidence or eliciting the testimony of the jailhouse informants and that his actions are entitled to absolute prosecutorial immunity.  Def. Townsend's Mot. at PageID.3512–3513 (Dkt.136).  The Detectives and Lehtola move for summary judgment on all remaining counts. Defs. Mot. at PageID.4507–4509 (Dkt. 145).

For the reasons that follow, the Court (i) denies Deering's motions for summary judgment (Dkt. 138); (ii) grants Townsend's motion for summary judgment (Dkt. 136); and (iii) grants Detectives' motion for summary judgment in part (Dkt. 145).[2]

## I.    BACKGROUND

Deering was convicted of felony murder after allegedly starting a house fire that resulted in the death of five children on April 6, 2000.  Am. Compl. at PageID.603–604.  The investigation

---

[1] Deering also brought Monell claims against Oakland County, (Counts VI, VII) Amend. Compl. at PageID.655–660 (Dkt. 56), but the Court has dismissed those claims (Dkt. 71).

[2] Because oral argument will not aid the Court's decisional process, the motions will be decided based on the parties' briefing.  See E.D. Mich. LR 7.1(f)(2); Fed. R. Civ. P. 78(b).  In addition to the pending motions, briefing includes: (i) as to Deering's motion: Defendants' response (Dkt. 153); (ii) as to Townsend's motion: Deering's response (Dkt. 157) and Townsend's reply (Dkt. 162); (iii) as to Detectives' motion: Deering's response (Dkt. 156) and Detectives' reply (Dkt. 164).

into the murder was performed by the Oakland County Sheriff Department and Detectives David Wurtz, Gary Miller, and William Harvey. Id. at PageID.604. Fire and arson investigator James Lehtola was also assigned to investigate the cause of the fire and concluded that the fire was intentionally set and likely originated on the front porch before spreading to the rest of the house. Lehtola Trial Test. at PageID.5314 (Dkt. 145-15). Deering contests the validity of this report, alleging that Lehtola "fabricated several findings," including that the fire started on the porch. Pl. Resp. at PageID.6732.

The Michigan State Police received an anonymous tip that Deering had set the fire in retaliation for an outstanding drug debt owed by Oliver Dean, an occupant of the house and the father of the children. Anonymous Tip at PageID.5316 (Dkt. 145-16); Defs. Mot. at PageID.4510. Deering was subsequently arrested for driving with a suspended license and a plastic gallon can with gas was found in his trunk. Mario Jones Inter. at PageID.5541 (Dkt. 145-37); Def. Mot. at PageID.4538. Deering was then interviewed by detectives from the Oakland County Sheriff's Department. In his first interview on April 21, 2000, with Detectives Miller and Harvey, Deering provided multiple inconsistent statements about his whereabouts on the night of the fire, including where he was and who he spent time with. Defs. Mot. at PageID.4512–4527. His suggested alibi witnesses all denied being with Deering in the approximate time period when the fire started. Id. at PageID.4518 (Darrius Cochran); PageID.4521 (Robin Love). Deering also failed two polygraph tests attesting to his whereabouts. Id. at PageID.4512–4513. Deering did confirm that Oliver Dean owed him a debt of $50. Id. at PageID.4528.

The Detectives also interviewed additional witnesses. Two witnesses, Pompey Davis and Mario Jones, claimed that "word on the street was that [Deering] started the fire" over a drug debt. Id. at PageID.4535, 4538; Pompey Davis Inter. at PageID.3114 (Dkt. 135-34); Mario Jones Inter.

3

at PageID.5541.  A third witness, Tahari Hawk, whose car was seen parked near the scene of the fire, identified Deering as a "big time dope dealer" and claimed that Deering himself did not set the fire, but did instruct Hawk's friend, Melody Hurst, to set the fire, and that Hurst had confessed to her.  Id. at PageID.4534; Hawk Interview at PageID.5484 (Dkt. 145-31).  Detective Miller's police report made no mention of Hawk's interview or admission, and Detective Wurtz could not be certain that the recording had been turned over to the prosecutor.  Pl. Resp. at PageID.6736.  Deering's defense attorney, Arnold Weiner, denies ever receiving a copy of this recording or a transcript of the interview.  Id.

A fourth witness, Rapalla Frame, told the police that one of the children who had survived the fire, Timmothy [sic] Dean, had a habit of playing with matches and had, on occasion, spilled containers of gasoline inside the house.  Rapalla Frame Interview at PageID.3150, 3154.  Frame also alleged that "there were a few wires sticking out" of the doorbell "that the kids used to always get shocked from."  Id. at PageID.3153.  As with Hawk's interview, the police report made no mention of the interview, the prosecutor did not have any evidence of receiving the video, and Deering's attorney testified that he did not receive the recording through discovery.  Pl. Resp. at PageID.6124–6125.

Finally, a fifth witness, Timmothy Dean, who was inside the house at the time of the fire and had survived, claimed that he did not think that Deering had set the fire.  Morrow Report at PageID.5296 (Dkt. 145-14).  The interview unfolded in two parts.  Although the first half of the interview was present in the prosecutor's trial file—and likely turned over to Deering's attorney—the second half was not.  Pl. Mot. at PageID.4206-4208; Defs. Resp. at PageID.6117-6122.  Deering's lawyer denied receiving the video recording and there was no record of this interview

in any police narrative report.  Morrow Report at PageID.5297 (Dkt. 145-14); Defs. Mot. at PageID.4549–4550.

In the second half of the interview, Dean testified that he had heard voices outside the house before the fire and that he recognized the voice of "little Juwan," who is a different individual than Deering.  Timmothy Dean Interview at PageId.4361 (Dkt. 139-7).  Dean also examined a photo lineup and identified Deering but stated that he did not think Deering had set the fire.  Id. at PageID.4361–4362.  Further, Dean claimed at one point that he had brought a container of gasoline into the house "earlier that day," although he later expressed some confusion. Id. at PageID.4347, 4378.

Although the police department attempted to obtain a warrant for Deering's arrest, the warrant was denied because of the absence of physical evidence or eyewitness testimony linking Deering to the scene and based on the possibility that there were "multiple possible suspects." Prosecutor's Disposition Record at PageID.5836 (Dkt. 145-63).  Prosecutors declined to bring charges against Deering on at least four occasions when requested to do so by Detective Wurtz. Pl. Resp. at PageID.6734; Wurtz Dep. at PageID.8551 (Dkt.157-4).

Deering was subsequently incarcerated on unrelated charges and allegedly confessed to setting the fire to three jailhouse informants, Raymond Jeffries, Ralph McMorris, and Philip Turner, between 2000 and 2003.  Defs. Mot. at PageID.4529.  The defendants claim that the first confession to Jeffries was due to a "natural" placement that was not arranged by police, see id., whereas Deering alleges that the informants were "strategically placed . . . to extract inculpatory information" by detectives Wurtz and Miller, see Pl. Resp. at PageID.6734.  Defendants concede that informants Turner and McMorris were intentionally placed.  Defs. Mot. at PageID.4530–4531.

All three informants were administered polygraph tests, and the examiner concluded that all three were truthful regarding their conversations with Deering.  Polygraph Results (Dkt. 145-30).

On the basis of this confession testimony, in late 2005, assistant prosecuting attorney Gregory Townsend was asked to review the evidence from the case for probable cause and for a warrant request for Deering.  Townsend Dep. at PageID.8919–8920.  Based on Lehtola's fire investigation, the confessions from the three jailhouse informants, Deering's inconsistent statements about his alibis, and testimony linking Deering to the fire, Townsend determined there was "strong probable cause."  Id. at PageID.8920.  The case was assigned to Townsend for prosecution.  Id. at PageID.8918.  Townsend claims that he turned over all discovery available to the prosecutor's office to Deering's attorney, Arnold Weiner, and that he also sent a letter inviting Weiner to visit his office and review the file before trial.  Id. at PageID.8938–8939.

During the preliminary examination of Deering, Townsend stipulated on the record that he would turn over the jail house informants' criminal histories to Weiner.  Id. at PageID.8938.  Townsend also stated on the record that one of the informants, McMorris, had a pending charge in a different county and that if McMorris testified truthfully, Townsend would inform the court of McMorris' cooperation at sentencing of the pending matter.  McMorris Prelim. Exam. Test. at PageID.5279 (Dkt.145-13).

At trial, Townsend relied "primarily" on Lehtola's fire investigation and Deering's confession testimony to the three jailhouse informants to make his case.  Defs. Mot. at PageID.4539-4540.  All three informants testified that they had not been given anything in exchange for their testimony, id. at PageID.4540, and all claimed that they had not learned of the allegations against Deering from police officers or any other source prior to his confessions to them, Pl. Resp. at PageID.6735.  Deering's defense focused on eyewitness testimony from three

6

neighbors that the fire did not start on the porch but rather inside the home.   Defs. Mot. at PageID.4541.   In opposition, the prosecutor offered testimony from several other witnesses who claimed that the front porch of the house was on fire first.   Id. at PageID.4541–4542.   Deering was convicted and sentenced to life without parole on August 23, 2006.   Pl. Resp. at PageID.6735.

Deering challenged his conviction on several grounds, including challenging Lehtola's conclusions and contesting the fire science.   People v. Deering, No. 274208 (Dkt. 145-9).   The Michigan Court of Appeals reasoned that Lehtola's conclusions were valid such that a rational trier of fact could have found beyond a reasonable doubt that Deering set the fire.   Id. at PageID.5171.   Deering also alleged that he suffered a Brady violation because Townsend did not disclose that one of the informants, Turner, had testified in a different case with a different prosecutor and received a sentence reduction as a result of his testimony.   Id. at PageID.5174.   The Court of Appeals held that there was no Brady violation attributable to Townsend because "no Michigan appellate court has ever imposed a duty upon a prosecutor to investigate and disclose information possessed by a prosecutor in a different locality."   Id.   At most, the Court concluded, there may have been a "tacit agreement" for Townsend to assist with leniency in future sentences, and such a disclosure was not required for prosecutors under Brady.   Id. at PageID.5174–5175.

In 2021, Deering, assisted by the Michigan Innocence Clinic, asked the Oakland County Prosecutor's Office to review the validity of his conviction.   Def. Townsend's Mot. at PageID.3504.   In response, Oakland County Prosecutor, Karen McDonald, sent a letter to the Michigan Innocence Clinic that certain information "may not have been provided to the defense." Id.   In addition, two fire experts provided conclusions that Lehtola had relied on outdated science and that "no investigator could credibly determine the fire was arson."   Pl. Resp. at PageID.6736.

McDonald, therefore, appointed Special Prosecutor Beth Morrow to review the case and Deering's conviction.  Id. at PageID.6737.

Morrow identified that while Wurtz and Townsend had testified at trial that the jailhouse informants did not receive any promises of leniency in exchange for their testimony, all three witnesses had received sentence deviations.  Jeffries, who faced a maximum sentence of life in prison, for a September 2001 offense, received a one-year sentence—well below the recommended 5–20 years—and the prosecutor's notes for the sentence stated that the "deviation [was] based on def. assisting in multiple homicide/arson—OCSD/Royal Oak Twp Case."  Morrow Report at PageID.5299.  Turner received a sentence reduction less than a month after testifying against Deering, with the prosecutor identifying Turner's assistance to Townsend as a factor.  Id. at PageID.5300–5302.  McMorris's case in a different county was dismissed, with notes revealing that the dismissal was influenced by his role as a "jail house snitch."  Id. at PageID.5302–5303.  While Townsend had alerted the court and Deering's attorney of this possibility during Deering's preliminary examination, Morrow identified an undisclosed letter from McMorris to Townsend referencing that McMorris had received assurances from Detectives "Dave [Wurtz] + Gary [Miller]" that he would "not [have] to worry."  Id. at PageID.5303.  McMorris also later admitted to receiving $2,500 from law enforcement in the Deering case.  Ashley Butler Aff. at PageID.7318 (Dkt.156-21).  However, McMorris had also previously noted that an FBI agent had his charges dismissed, not the Detectives or Townsend.  McMorris Prelim. Exam. at PageID.5279.

Morrow further identified that the police department's interview of Timmothy Dean may not have been turned over to the defense, even though the second half included Dean "giv[ing] information that is both impeachment evidence to the prosecution's theory of the case and exculpatory to Deering."  Morrow Report at PageID. 5296.  Morrow stated that although she could

not be sure whether the second half of the recording was provided to Deering's attorney, the video was not present in the prosecutor's file and was, therefore, likely not produced. Id. at PageID.5296–5297.

Morrow concluded that the failure to present Dean's full recording and the failure to divulge the informants' relationship with the Detectives and the prosecutor amounted to a constitutional violation. Id. at PageID.5304. Based on this report, the Oakland County Prosecutor's Office moved to vacate Derring's conviction. Judge Jeffery Matis entered an order dismissing all charges against Deering. Mot. Hr'g (Dkt. 156–29). Judge Matis specifically noted that "[t]he state possessed evidence that was favorable to the defendant," such as Dean's interview, and that "defendant [could not have] obtained it with any reasonable diligence." Id. at PageID.7451. Judge Matis also suggested that "[h]ad the evidence been disclosed," specifically referencing both "[Dean's] interview, as well as the evidence with the jailhouse informants," "a reasonable probability exists the outcome would have been different." Id.

## II.   ANALYSIS[3]

The Court's analysis begins with the claims against the Detectives, followed by the claims against arson investigator Lehtola, and concludes with the claims against Prosecutor Townsend.

### A.   DEERING'S CLAIMS AGAINST THE DETECTIVES

---

[3] In assessing whether a party is entitled to summary judgment, the Court applies the traditional summary judgment standard as articulated in Scott v. Harris, 550 U.S. 372, 380 (2007). A court will grant a motion for summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the movant makes an initial showing that there is an absence of evidence to support the nonmoving party's case, the nonmovant can survive summary judgment only by coming forward with evidence showing there is a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324–325 (1985).

Deering has raised five claims against the Detectives: (i) <u>Brady</u> violation; (ii) fabrication of evidence under § 1983; (iii) malicious prosecution under § 1983 and state law; (iv) conspiracy to interfere with civil rights under § 1983; and (v) detention without probable cause under § 1983. Am. Compl. at PageID.634–655.  The Detectives move for summary judgment on all claims.

The Detectives argue that they are protected against all § 1983 claims by qualified immunity.  Defs. Mot. at PageID.4556–4557.  Public officials are entitled to qualified immunity when the challenged conduct did not violate "clearly established" constitutional rights "of which a reasonable person would have known."  <u>Jackson v. City of Cleveland</u>, 64 F.4th 736, 745 (6th Cir. 2023).  The plaintiff has the burden of showing that (i) a constitutional right was violated and (ii) the right was "clearly established" at the time of the violation.  <u>Pearson v. Callahan</u>, 555 U.S. 223, 232 (2009).  A constitutional right is "clearly established" if it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right."  <u>Mullenix v. Luna</u>, 577 U.S. 7, 11–12 (2015).  This requires a consideration of whether the "particular conduct" at issue violates the Constitution.  <u>Id.</u> at 12.  Although the plaintiff need not provide "a case directly on point," the plaintiff must identify "existing precedent" that would "place[] the . . . constitutional question beyond debate," <u>id.</u> (quoting <u>Ashcroft v. al-Kidd</u>, 563 U.S. 731, 741 (2011)), and "truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances," <u>Gragg v. Ky. Cabinet for Workforce Dev.</u>, 289 F.3d 958, 964 (6th Cir. 2002) (punctuation modified).  District courts can "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand."  <u>Pearson</u>, 555 U.S. at 236.

10

The Detectives only develop the first prong of the qualified immunity analysis in their briefing—whether they in fact violated Deering's constitutional rights.  See Defs. Mot. at PageID.4557-4590.  No argument is developed as to whether the asserted rights were clearly established.  Id. at PageID.4557 (concluding that "[p]laintiffs are unable to establish that Defendants knowingly violated the law.").  Defendants' failure to offer any argument as to the second prong of the qualified immunity analysis amounts to a waiver of the argument.  See Evans v. Vinson, 427 F. App'x 437, 447 (6th Cir. 2011) (holding that defendants waived the qualified immunity defense because they "asserted the defense of qualified immunity . . . in a one-and-a-half page statement of the law with no attempt at argument, and they cited only the first prong of the test"); Howard v. Collins, No. 21-cv-12036, 2024 WL 5398545, at *16 (E.D. Mich. Jan. 25, 2024) (accepting that defendants waived the qualified immunity argument because "Defendants' brief in support of their motion for summary judgment makes no argument that the rights [plaintiff] alleges were violated were not clearly established at the time of his prosecution").  Accordingly, the Court should only analyze whether the evidence, when viewed in the light most favorable to the plaintiff, suggests that the Detectives violated Deering's constitutional rights.

The Court will, therefore, assess each of the constitutional, § 1983, and state law claims on their merits: (i) Brady violation; (ii) fabrication of evidence; (iii) malicious prosecution; (iv) conspiracy to interfere with civil rights; and (v) detention without probable cause.

### 1.  **Brady Violation**

Deering alleges that the Detectives withheld exculpatory material and impeachment evidence in violation of Brady.  "Under Brady v. Maryland, the government has a constitutional obligation to furnish a criminal defendant with any exculpatory evidence related to the defendant's guilt or possible punishment," Robinson v. Mills, 592 F.3d 730, 735 (6th Cir. 2010), including

evidence that a defendant can use to impeach government witnesses.  Bell v. Bell, 512 F.3d 223, 232 (6th Cir. 2008) (citing United States v. Bagley, 473 U.S. 667, 676–677 (1985)).  While Brady involved the actions of prosecutors, "police can commit a constitutional deprivation analogous to that recognized in Brady by withholding or suppressing exculpatory material."  Jackson, 925 F.3d at 814.

To establish a Brady violation, a plaintiff must show that: (i) the state possessed evidence that was favorable to the plaintiff; (ii) the state suppressed the relevant evidence, either purposefully or inadvertently; and (iii) had the evidence been disclosed, a reasonable probability exists that the outcome of the proceedings would have been different.  Id.  Evidence is "favorable" if it is "exculpatory" or "impeaching" and would "undermin[e] witness credibility."  United States v. McClellon, 260 F. Supp. 3d 880, 884 (E.D. Mich. 2017); Strickler v. Greene, 527 U.S. 263, 282 (1999); McNeill v. Bagley, 10 F.4th 588, 598 (6th Cir. 2021).  Evidence is deemed to be "suppressed" if the state failed to disclose it, and the defendant could not have reasonably obtained the information "from another source."  United States v. Graham, 484 F.3d 413, 417 (6th Cir. 2007); Jalowiec v. Bradshaw, 657 F.3d 293, 311 (6th Cir. 2011) (noting that the "Brady rule does not assist a defendant who is aware of essential facts that would allow him to take advantage of the exculpatory evidence at issue, such as when the evidence in question would have been discoverable with minimal investigation by defense counsel" (punctuation modified)).  Finally, a "reasonable probability" is probability that is "sufficient to undermine confidence in the outcome" of the trial.  Robinson, 592 F.3d at 735.  In applying this standard, the court should only consider whether the "guilty verdict . . . is worthy of confidence in the absence of the suppressed evidence," not whether "there was sufficient evidence to support [the] conviction" regardless of the evidence.  Thomas v. Westbrook, 849 F.3d 659, 663 (6th Cir. 2017).

Deering alleges that the Detectives withheld exculpatory material and impeachment evidence, including:

(i)     the second half of Timmothy Dean's videotaped interview where Dean claimed that "Juwan" and "Little Juwan" are two distinct individuals, that Deering's voice is not the voice he overheard the night of the fire, that he was "sure" that Deering was not the perpetrator in a photo lineup, and that he brought a container of gasoline into the home on the day of the fire, and his sister spilled the gasoline in the hallway and living room;

(ii)    a recording of Rapalla Frame where she claimed that the children often played with matches, that wires on the doorbell frequently "sparked," and that the children's father, Oliver Dean, had threatened to burn the house down;

(iii)   a recording of Tahara Hawk that another individual, Melody Hurst, had admitted to starting the fire; and

(iv)    defendants' offers of leniency and favorable treatment to the jailhouse informants.

Am. Compl. at PageID.535–536.  The Court denies both Deering and the Detectives' motions for summary judgment with regards to the Dean interview and holds that a triable issue exists as to whether a <u>Brady</u> violation occurred.  Additionally, the Court holds that a triable issue of fact exists as to whether the failure to disclose the recording of Frame and Hawk and whether the failure to disclose evidence suggesting that the jailhouse informants received leniency and pecuniary benefits constitute a <u>Brady</u> violation.

### a.  Timmothy Dean's Interview

Deering alleges that no genuine issue of material fact exists that the Detectives' failure to disclose the second half of the Timmothy Dean interview "undermined confidence in the verdict" and, therefore, constitutes a <u>Brady</u> violation.  Pl. Mot. at PageID.4191.  By contrast, the Detectives argue that the evidence was not exculpatory, freely available to Deering and his attorney through various sources, and immaterial to the outcome of the case.  Defs. Resp. at PageID.6756–6760.

13

For the foregoing reasons, the Court holds that there is a triable issue as to whether there was a Brady violation with respect to the Dean interview.

### i.   Whether the Non-Disclosed Evidence Was "Favorable"

The parties dispute whether the contents of the Dean video could be "favorable" and exculpatory.  Deering argues that the evidence was favorable for two reasons: (i) it raised the possibility of another "legitimate suspect," given that Dean alleged that he heard "Little Juwan," a different individual than Juwan Derring, on the night of the fire and failed to identify Deering as the perpetrator in a photo line-up; and (ii)  it corroborated Deering's "defense theor[y] at trial" that the fire started accidentally inside the house, given that Dean suggested that he had brought a container of gasoline into the house "earlier that day" and that his sister had spilled it in "the hallway and the front room."  Id. at PageID.4206–4208.

By contrast, the Detectives allege that the evidence cannot be deemed exculpatory because (i) Dean's testimony in the interview never expressly "eliminated Deering as the perpetrator"; (ii) Dean's admission that the fire originated on the porch would actively contradict the defense's theory that the fire accidentally started inside the house; and (iii) Dean's statements as to the timing of when he may have spilled the gasoline are unclear, with him clarifying at one point that the spill was "months before the fire occurred."  Defs. Resp. at PageID.6117–6122.  As support, the defendants point to Deering's defense attorney Arnold Weiner's concession that it would have been unfavorable to the defense strategy to present a witness who would claim that the fire originated on the porch.  Arnold Weiner Dep. at PageID.5768 (Dkt. 145-54) ("Q: "[Dean][ hurt your case because he said the fire started on the porch. . . . A: Right. Q: That hurt your case, correct? We just established that.  A: It obviously did.").

Defendants overstate that evidence is only exculpatory if it tends to "eliminate[]" the accused as the perpetrator of the alleged crime. See Defs. at PageID.4562. The Sixth Circuit has held that the inquiry into the "favorability of the evidence . . . is a relatively low threshold for a petitioner to meet." McNeill, 10 F.4th at 598; Gumm v. Mitchell, 775 F.3d 345, 363 (6th Cir. 2014) ("[T]he materiality and prejudice prongs do not require a defendant to show that disclosure of the evidence would have ultimately led to an acquittal."). This inquiry looks to whether the "amount of undisclosed evidence was slight as opposed to voluminous" and whether the undisclosed evidence could "weaken" the state's case, "reveal that the police conducted a shoddy investigation," or "lessen the credibility of the State's case." Hughbanks v. Hudson, 2 F.4th 527, 541 (6th Cir. 2021) (punctuation modified).

For example, Mack v. Bradshaw, which the Detectives' briefing heavily relies on, did not find a Brady violation because the alleged suppressed evidence was slight relative to the significant incriminating evidence—both witness testimony and physical evidence—and because the evidence did not "undercut" the incriminating evidence offered. 88 F.4th 1147, 1158 (6th Cir. 2023). By contrast, Gumm v. Mitchell upheld a Brady violation when the police failed to turn over reports "about multiple other suspects" because it would "call into question the thoroughness of the investigation," especially "in light of the small amount of evidence that the state adduced at Petitioner's trial." 775 F.3d at 370.

Here, the facts are more analogous to Gumm than Mack. The Dean interview pointed to alternative suspects and alternative causes of the fire, which would call into question the quality of the state's case, especially when, as in Gumm, the state relied on a "small amount of evidence" to convict Deering and when, as discussed below, the credibility of the key witnesses could be put

into question.  In this context, the Court concludes that portions of the Dean interview provided "favorable" and "exculpatory" evidence that would undermine the state's case.

### ii.   Whether the Non-Disclosed Evidence Was Suppressed

Deering claims that the second half of the Dean interview was suppressed because "no evidence exists showing that the Oakland County Prosecutor's Office, the trial prosecutor, or the defense knew of this evidence" and Detective Wurtz's narrative report of the interview excluded these admissions.  Pl. Mot. at PageID.4210–4212; Wurtz Dep. at PageID.8563–8564.  By contrast, the Detectives challenge that the evidence was suppressed because: (i) Weiner could not recall what evidence he had at the time of the trial, including whether he had the second half of the interview and (ii) even if the evidence was not turned over, Weiner had multiple avenues to obtain the information including by interviewing Dean himself.  Defs. Resp. at PageID.6124–6126.  The Detectives further suggest that because the first half of the Dean interview ended with the interviewer indicating "that they will take a short break and then continue," Deering's attorney should have been on notice that there may have been an additional half, and that Dean may have "possessed more information after the break."  Defs. Resp. at PageID.6123.

There remains a material dispute of fact as to whether the evidence was turned over by the Detectives to the prosecutor's office and whether Weiner reviewed the Dean tape at all—either the first half or the second half.  Morrow, in her investigation, confirmed that she could not be sure of all the discovery that Weiner received, but that the video was not "in the prosecutor's box" of evidence.  Morrow Dep. at PageID.5695 (Dkt. 145-50).  Whether the video was simply not turned over by the Detectives, either intentionally or inadvertently, or was misplaced during the chain of custody at the prosecutor's office remains an open question.

Detectives alternatively contend that Deering's attorney could have obtained the information himself by interviewing Dean. While there is no <u>Brady</u> violation if "a defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory information, or where the evidence is available . . . from another source," <u>Coe v. Bell</u>, 161 F.3d 320, 344 (6th Cir. 1998) (punctuation modified), courts have been wary of adopting "a broad rule that any information possessed by a . . . witness must be considered available to the defense for <u>Brady</u> purposes." <u>Boss v. Pierce</u>, 263 F.3d 734, 740 (7th Cir. 2001); <u>Clark v. Abdallah</u>, 131 F.4th 432, 456 (6th Cir. 2025) ("Like the Seventh Circuit, we find untenable a broad rule that any information possessed by a defense witness must be considered available to the defense for <u>Brady</u> purposes." (punctuation modified)).

This is because "it is simply not true that a reasonably diligent defense counsel will always be able to extract all the favorable evidence a . . . witness possesses." <u>Boss</u>, 263 F.3d at 740. For example, a witness may become "uncooperative or reluctant" or "may have forgotten or inadvertently omitted some important piece of evidence previously related to the prosecution or law enforcement." <u>Id.</u> Cases cited by the defendant, including <u>Coe v. Bell</u> and <u>United States v. Clark</u> are readily distinguishable from the facts here because the cases involved testimony of witnesses that the defendant himself had identified to the police or evidence "disclosed at the earlier detention hearing in the presence of the [then] defendant," <u>Clark</u>, 928 F.2d 733, 738 (6th Cir. 1991). And the Sixth Circuit has expressly held that imposing a "due diligence" requirement on a defendant's attorney to "discover[] exculpatory information on the defendant"—such as independently interviewing witnesses and co-defendants possessing exculpatory information that the prosecution has already identified but not disclosed—is improper because it "releases the

prosecutor from the duty of disclosure" and is precisely "the type of information <u>Brady</u> was designed to open." <u>United States v. Tavera</u>, 719 F.3d 705, 711–712 (6th Cir. 2013).

The Court finds that, under <u>Tavera</u>, Deering's attorney is not to be outright faulted for his failure to independently interview Dean, as this would unfairly "relieve[] the government of its <u>Brady</u> obligations." <u>Id.</u> at 711.

### iii.  Whether the Non-Disclosed Evidence Was Prejudicial

Finally, Deering relies on the opinion of Chief Assistant Prosecuting Attorney David Williams and Judge Matis to conclude that the failure to disclose the Dean interview "compromised the integrity of the verdict" and that "a reasonable probability exists the outcome would have been different" had the recording been disclosed.  Pl. Mot. at PageID.4213–4214.  By contrast, the Detectives argue that even if the evidence was withheld, the proceeding would not have been different because the defense presented its alternative theory that the fire started inside the house, but the jury instead credited Deering's confession testimony and his inconsistent alibi. Defs. Resp. at PageID.6127–6131.  Defendants also suggest that Deering's confessions "negate the materiality of the recorded interviews" because the jury would credit the confession over any doubt created by the suppressed evidence.  Defs. Mot. at PageID.4572.

Defendants misstate the prejudice analysis.  It is not necessary that "every item of the State's case would have been directly undercut if the <u>Brady</u> evidence had been disclosed." <u>Bies v. Sheldon</u>, 775 F.3d 386, 399 (6th Cir. 2014).  Nor must the suppressed evidence be of the variety that would "more likely than not" have resulted in an acquittal had the "new evidence been admitted."  <u>Wearry v. Cain</u>, 577 U.S. 385, 392 (2016).  Instead, the new evidence must only sufficiently "undermine confidence" in the verdict when viewed "as a whole."  <u>Smith v. Cain</u>, 565 U.S. 73, 76 (2012).

18

As Deering points out in his brief and as discussed below, because of the significance of the evidence withheld with regards to the potential arrangements made with the jail house informants—evidence which could undermine their credibility—the alternative suspects and accidental causes raised by the Dean interview could be favorably received by a trier of fact. Cf. Hughbanks, 2 F.4th at 542 (noting that a "defendant's confession d[oes] not bar [a court] from concluding that the disclosed evidence put the whole case in such a different light that the verdict was no longer worthy of confidence"). Prosecutor Townsend, himself, conceded that if he had possessed the second half of the interview, he would have disclosed it to Deering's attorney. Townsend Dep. at PageID.8927. Judge Matis went even further in suggesting that "a reasonable probability exists the outcome would have been different" had the Dean interview been disclosed. Pl. Mot. at PageID.4214. Therefore, there remains a triable issue as to whether the alleged suppressed evidence undermines confidence in the original verdict.

For the foregoing reasons, the Court denies the motion for summary judgment on the issue of the Dean interview.

### b. Rapalla Frame and Tahara Hawk Recording

Deering also alleges that Defendants' failure to disclose the Frame and Hawk recordings constitute a Brady violation. First, Deering claims that both recordings were "favorable" because they suggested alternative suspects and alternative causes for the fire. Pl. Resp. at PageID.6761–6763. Specifically, Frame suggested that Oliver Dean had warned that he would "just burn [the house] to the ground" after learning of his wife's affair and Hawk suggested that her girlfriend, Melody Hurst, had confessed to starting the fire. Id. at PageID.6761–6762. And Frame's testimony also speculated that the electric wiring near the doorbell which "frequently sparked" and that Timmothy Dean's tendency to play with matches and spill gas in the house may have been

responsible for the fire.  Id. at PageID.6761.  Second, Deering claims that the recordings were suppressed because the transcripts and/or tapes were never turned over to the prosecutor or to Deering's attorney.  Id. at PageId.6762.  Finally, Deering claims prejudice because Deering's attorney testified that he may have adjusted his defense strategy were he aware of these admissions by bolstering the possibility of alternative suspects or accidental causes of the fire.  Id. at PageID.6763.

Defendants dismiss these recordings as "speculative witness theories regarding how the fire could have started" and that "Defendants are not required to provide the defense with legal theories, and witness statements regarding potential theories" under Brady.  Defs. Resp. at PageID.6122.  Defendants' cursory dismissal, however, misses the mark.  While it is true that officers and "[p]rosecutors are not necessarily required to disclose every stray lead and anonymous tip," Gumm, 775 F.3d at 364, disclosure is required of suspects "confess[ing] to killing [the victim]" or of suspects who "were implicated by trace evidence, or were linked to any activities that were consistent with" the crime, Hughbanks, 2 F.4th at 537.  As with the Dean interview, the defendants cannot simply summarily conclude there is no Brady violation because Deering's attorney could have interviewed each and every witness.  Defs. Mot. at PageID.4571.  Because "materiality refers to the effect of the suppressed evidence collectively, not item by item," non-disclosure of potential suspects—especially those who had confessed—and evidence that would allow a party to "construct a compelling alternative narrative" could constitute a Brady violation. Hughbanks, 2 F.4th at 540–541 (punctuation modified).

Accordingly, there is a triable issue of fact here as to whether failure to disclose the alternative suspects and alternative causes for the fire would undermine confidence in the verdict, especially considering the volume of undisclosed evidence and the credibility issues raised with

the prosecution's case.  The Court, therefore, denies the Detectives' motion for summary judgment as it relates to the Frame and Hawk recordings.

### c.  Offers of Leniency and Favorable Treatment

The existence of agreements of leniency made with jailhouse informants prior to their testimony must be disclosed.  See Kennedy v. Mackie, 639 F. App'x 285, 292 (6th Cir. 2016). While the prosecution is free to reward witnesses for their cooperation—including by providing favorable treatment in future criminal cases—it must disclose any formal or informal tacit agreement made with informants prior to their testimony.  See Akrawi v. Booker, 572 F.3d 252, 263 (6th Cir. 2009) (holding that there is only a Brady violation if the prosecutor provides some assurance or promise of favorable treatment prior to the witness's testimony and such a tacit agreement is not disclosed); Bell v. Bell, 512 F.3d 223, 233 (6th Cir. 2008) (noting that even a "less formal, unwritten or tacit agreement" must be disclosed).

At trial, Detective Wurtz expressly denied that the informants received any promises of leniency or any favorable treatment for their cooperation.  Pl. Resp. at PageID.6764.[4]  Yet, taking the facts in the light most favorable to Deering, all three informants may have received assurances of leniency during sentencing in connection with their involvement with the Deering case. McMorris's case in a different county was dismissed, with notes revealing that the dismissal was influenced by his role as a "jail house snitch" and an additional, undisclosed, handwritten letter from McMorris to Townsend referencing that McMorris had received assurances from Detectives "Dave [Wurtz] + Gary [Miller]" that he would "not [have] to worry."  Morrow Report at PageID.5303.  McMorris also later admitted to receiving $2,500 from law enforcement in the

---

[4] "Q: Okay. No promises of leniency?  A: No.  Q: No promises of early release?  A: No, sir. . .. Q: They were simply good, Oakland County Jail citizens attempting to help law enforcement, correct?  A: Sure, yes."

Deering case and that he was a paid informant for Wurtz and Miller for years.  Pl. Resp. at PageID.6774.   Jeffries received a sentencing deviation in 2001 for "assisting in multiple homicide/arson—OCDS/Royal Oak Twp Case," referencing the Deering case.  Id. at PageID.6765.  And Turner, less than a month after testifying against Deering, received a sentence of 62 months— the lowest sentence allowed by the guidelines—even though he faced multiple charges with a sentencing guideline range of 117–320 months, after the prosecutor acknowledged that Turner had been "of some assistance to the prosecutor [in the Deering case]."  Id. at 6765–6766.  Given the potential evidence of assurances provided to McMorris, a jury could reasonably conclude that Jeffries and Turner too had entered into tacit agreements for leniency given that law enforcement provided support "at or around critical junctures in their criminal cases."  United States v. Lewis, 850 F. Supp. 2d 709, 745 (N.D. Ohio 2012).

Defendants argue that they were under no obligation to disclose "additional bas[e]s on which to challenge" the credibility of the jailhouse informants because their "credibility ha[d] already been shown to be questionable" and was "subject to extensive attack by reason of other evidence." Defs. Mot. at PageID.4579–4580 ("In this matter, the jury was advised of the jailhouse informants' criminal history, and their credibility was examined at trial.").  Yet, in justifying this conclusion, defendants cite Williams v. Bagley where the court was considering whether additional discovery was warranted for a habeas proceeding, not whether there was a Brady violation for failing to turn over evidence.  380 F.3d 932, 977 (6th Cir. 2004).

By contrast, here, disclosure of this evidence—"plea deals, payments, and dismissals the informants received"—would have undoubtedly allowed Deering's attorney to cast doubt on the credibility of the informants' testimony.  Pl. Resp. at PageID.6775.  Undermining the credibility of these informants was critical because they provided the key testimony directly linking Deering

22

to the crime when no physical evidence or direct eyewitness testimony ever implicated Deering. A defendant undoubtedly "suffers prejudice from the withholding of favorable impeachment evidence when the prosecution's case hinges on the testimony of [a] witness." Harris v. Lafler, 553 F.3d 1028, 1034 (6th Cir. 2009). Failure to inform defense counsel of favorable treatment received by an informant that may "call into question [the witness's] credibility and truthfulness" and can constitute a Brady violation. See Thomas v. Westbrooks, 849 F.3d 659, 664 (6th Cir. 2017) (finding a Brady violation when the prosecution did not disclose that the witness received $750 before trial); Robinson v. Mills, 592 F.3d 730, 738 (6th Cir. 2010) (holding that even the witness's receipt of $70 from the police department for cooperation in an unrelated prosecution needed to be disclosed and failure to do so constituted a Brady violation).

Accordingly, the Court concludes that there is a triable issue as to whether defendants entered into a tacit agreement with the jailhouse informants and whether failure to disclose evidence of leniency and pecuniary benefits constitutes a Brady violation.

## 2. Fabrication of Evidence

A fabrication of evidence claim can be raised under both the Fourth Amendment and the Due Process Clause of the Fourteenth Amendment. Salter v. Olsen, 605 F. Supp. 3d 987, 1000 (E.D. Mich. 2022). Here, Deering's complaint seemingly raises both, see Am. Compl. at PageID.638, but both Deering's and the Detectives' (and Lehtola's) briefing only reference the Fourteenth Amendment claim, see Defs. Mot. at PageID.4593; Pl. Resp. at PageID.6786. Therefore, the Court should only consider the fabrication of evidence claim under the Due Process Clause with respect to the Detectives.

To succeed on such a claim, the plaintiff must show that "evidence [was] knowingly fabricated and [that] a reasonable likelihood exists that the false evidence would have affected the

decision of the jury." Webb v. United States, 789 F.3d 647, 667 (6th Cir. 2015). This is distinct from a claim of withholding evidence (i.e. Brady) because "fabrication involves manufacturing damaging evidence whereas withholding evidence is about suppressing favorable evidence." Cotton v. Hughes, No. 22-cv-10037, 2025 WL 410077, at *23–24 (E.D. Mich. Feb. 5, 2025) (noting that "[a]n officer can manufacture evidence in a variety of ways" such as by "coercing a false statement from a witness," "falsely attribut[ing] statements to [a witness] that she never said" or "fabricat[ing]" forensic and ballistic reports). It is without question that were the informants' testimony knowingly fabricated, it would reasonably have affected the jury's decision because the prosecution's case largely rested on this testimony. Therefore, the central question here is whether there is a triable issue that the Detectives and Lehtola "knowingly fabricated" the testimony.

The Detectives argue that the evidence was not fabricated because the first set of interactions between Deering and the informants "occurred organically, without any police involvement," the informants "were not provided with any information regarding the underlying criminal case," and the informants were not offered any promises or assurances of leniency or favors. Defs. Mot. at PageID.4595–4596. By contrast, Deering alleges that Detectives Wurtz and Miller fabricated evidence by "intentionally placing jailhouse informants in Deering's cell . . . to manufacture faux admissions," coaching the informants by providing them with newspapers detailing the allegations against Deering, procuring false testimony from the informants, and concealing promises of leniency in exchange for testimony through "telegraphed" questioning. Am. Compl. at PageID.639.

While jailhouse informants "present special credibility problems" and "often present testimony that can readily be fabricated," Lewis, 850 F. Supp. 2d at 738, one cannot automatically presume that evidence was fabricated simply because informants were subsequently offered

24

leniency in exchange for their testimony.  Instead, there must be evidence that the allegedly fabricated testimony consisted entirely of "facts fed to [the informants] or objectively wrong statements" known to the Detectives.  <u>Price v. Montgomery Cnty., Ky.</u>, 72 F.4th 711, 723 (6th Cir. 2023).

Here, this bar has not been met.  While there may have been some pressure on the informants, <u>see</u> Pl. Resp. at PageID.6787, "there is not enough evidence to say that [the testimony] was coerced, never mind fabricated."  <u>Price</u>, 72 F.4th at 724.  Deering points only to an affidavit by an attorney from the Michigan Innocence Clinic stating that one of the informants, McMorris, "indicated" to her that he had been "coerced, coached, and/or incentivized" in part based on the style of questioning by the Detectives.  Ashley Butler Aff. at PageID.7317.  This is hearsay and not proper in opposition to a summary judgment motion.  <u>Sperle v. Mich. Dep't of Corr.</u>, 297 F.3d 483, 795 (6th Cir. 2002) (a triable issue of fact may not be created via hearsay).  It is also speculative and conclusory.  <u>See Price</u>, 72 F.4th at 723 ("While it is possible that the unrecorded parts of the interrogation involved witness coaching, that is always the case with anything conducted off the record" and "[w]ithout more" cannot be the basis of a fabrication claim.).  And Deering points to no evidence suggesting coaching or fabrication for the other two informants, including the first informant, Jeffries, whom the Detectives argue was not intentionally placed.  Defs. Mot. at PageID.4595.  Deering additionally alleges that the jailhouse informants <u>may</u> have read newspaper articles detailing the allegations against him, including articles suggesting the Detectives' theories of the case, <u>see</u> Pl. Resp. at PageID.6787, but Deering can point to no evidence that the newspapers were provided to the inmates by the Detectives with the intention of developing fabricated testimony.

There is reason to doubt the credibility of the informant testimony and the Detectives may well have withheld exculpatory evidence, as discussed above. But this alone cannot support a fabrication claim that the Detectives <u>manufactured</u> false informant testimony. <u>Cotton</u>, 2025 WL 410077, at *25 ("Because the evidence produced by Plaintiffs does not support the inference that [the Defendant] manufactured—as opposed to withheld—evidence, they cannot bring a fabrication of evidence claim against him.").

Therefore, the Court grants the Detectives' summary judgment motion with regards to the fabrication of evidence claim.

### 3. Malicious Prosecution

#### a. § 1983 Claim

The Sixth Circuit "recognize[s] a . . . constitutionally cognizable claim of malicious prosecution under the Fourth Amendment," which "encompasses wrongful investigation, prosecution, conviction, and incarceration." <u>Barnes v. Wright</u>, 449 F.3d 709, 715–716 (6th Cir. 2006). To succeed on a malicious prosecution claim, the plaintiff must show that: (i) a criminal prosecution was initiated against the plaintiff and that the defendants "made, influenced or participated in the decision to prosecute," (ii) the defendants lacked probable cause for the prosecution; (iii) that the plaintiff suffered a deprivation of liberty because of the legal proceeding, apart from the initial arrest; and (iv) the criminal prosecution was resolved in the plaintiff's favor. <u>Sykes v. Anderson</u>, 625 F.3d 294, 308–309 (6th Cir. 2010) (punctuation modified).

For police officers, the "prototypical" case is that of an official who "knowingly submits false information to the prosecutor that formed the basis of the charging decision," even if the official themselves did not make the charging decision. <u>Sanford v. Russell</u>, 381 F. Supp. 3d 905, 921 (E.D. Mich. 2019); <u>Jones v. City of Elyria</u>, 947 F.3d 905, 918 (6th Cir. 2020) (noting that

officers who include "falsehoods in [their] investigatory materials, knowing that prosecutorial reliance is likely" are subject to liability).  However, there must be a showing that the officers engaged in "deliberate or reckless falsehoods" that "result[ed] in arrest and prosecution without probable cause."  <u>Newman v. Twp. of Hamburg</u>, 773 F.3d 769, 772 (6th Cir. 2014).  In other words, the officer's actions "must be marked by some kind of blameworthiness, something beyond mere negligence or innocent mistake, to satisfy the elements of a malicious prosecution claim." <u>Johnson v. Moseley</u>, 790 F.3d 649, 655 (6th Cir. 2015).

Here, the parties primarily dispute whether there was probable cause for the prosecution. Probable cause exists when the facts and circumstances would warrant a "prudent man in believing that the offense has been committed."  <u>Henry v. United States</u>, 361 U.S. 98, 102 (1959).  This determination is based on the "totality of the circumstances" and consideration of "both the inculpatory and exculpatory evidence."  <u>Wesley v. Campbell</u>, 779 F.3d 421, 429 (6th Cir. 2015). Finding probable cause is not a "high bar," <u>Kaley v. United States</u>, 571 U.S. 320, 338 (2014) as it "does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction," <u>Adams v. Williams</u>, 407 U.S. 143, 149 (1972).  "It requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." <u>District of Columbia v. Wesby</u>, 583 U.S. 48, 57 (2018) (punctuation modified).

Deering argues that the Detectives manufactured probable cause by intentionally excluding exculpatory evidence and coaching the jailhouse informants to providing false testimony.  <u>See</u> Pl. Resp. at PageID.6779–6783.  Because the Detectives knew that the inculpatory evidence was defective and because they intentionally disregarded exculpatory evidence, Deering argues that there was insufficient support for a probable cause determination.  <u>Id.</u>  The Court, however, holds

that there was probable cause here and grants summary judgment in favor of the Detectives on the malicious prosecution claim.

First, the Detectives received confession testimony from three separate jailhouse informants, as well as testimony from multiple additional sources placing Deering at the scene of the crime—or suggesting a motive for the crime—that strongly supports a probable cause finding. Courts treat "confession . . . [a]s strong evidence of [] guilt" that can support a finding of probable cause, Harbison v. Bell, 408 F.3d 823, 834 (6th Cir. 2005), especially when there is some independent corroborating evidence, see United States v. Crawford, 943 F.3d 297, 306–307 (6th Cir. 2019) (noting that credibility of informants can be bolstered if "multiple sources provid[e] the same information" or certain information is "verif[ied] . . . where plausible to do so"); United States v. Baker, 976 F.3d 636, 649 (6th Cir. 2020) (collecting cases and upholding a determination of probable cause even though the officer relied primarily on "hearsay statement[s] from [an] unnamed subject" (punctuation modified)); United States v. May, 399 F.3d 817, 824–825 (6th Cir. 2005) (upholding a probable cause finding even though there was doubt or insufficient proof of the credibility of a known informant because the informant's "identity [is] known to the police and [the informant] would be subject to prosecution for making a false report"). And in Lester v. Roberts, the Sixth Circuit held that "inconsistencies" and "discrepancies" between testimonies "do not show the absence of probable cause," especially because "[o]nce probable cause is established, an officer is under no duty to investigate further or to look for additional evidence which may exculpate the accused." 986 F.3d 599, 610–612 (6th Cir. 2021) (punctuation modified).

Second, the Detectives rightly point to Deering's inconsistent statements regarding his timeline and location on the day of the fire and his inability to identify an alibi that would corroborate his version of events as supportive of probable cause. Defs. Mot. at PageID.4589–

28

4590.  Deering suggests that probable cause cannot be established based on these facts because he "informed officers that he had dyslexia, stated that he often confused times, and repeatedly disclosed significant memory problems."  Pl. Resp. at PageID.6781.  However, considering the totality of the circumstances, these inconsistencies combined with witness testimony suggesting motive and hearsay statements about Deering's involvement rest on facts sufficient to support probable cause.  See Meakens v. Benz, 515 F. App'x 414, 418 (6th Cir. 2013) ("[A]n officer is under no obligation to give any credence to a suspect's story nor should a plausible explanation in any sense require the officer to forego arrest pending further investigation, if the initially discovered facts provide probable cause." (punctuation modified)).

Accordingly, the Court grants summary judgment on the malicious prosecution claim, because "the presence of probable cause for a prosecution…dooms any Fourth Amendment claim."  Lester, 986 F.3d at 609; Darrah v. City of Oak Park, 255 F.3d 301, 312 (6th Cir. 2001) (noting that a claim for malicious prosecution must be rejected when there is probable cause).  Deering's allegations that the withholding of allegedly exculpatory evidence which would undermine the prosecution's case, are better suited for the Brady violation claim and for arguments as to "why the government did not prove its case beyond a reasonable doubt than arguments . . . about why probable cause did not exist for the government to bring that case."  Lester, 986 F.3d at 610.

**b.  State Law Claim**

Deering also raises a claim for malicious prosecution under Michigan common law.  The claim requires a showing that: (i) "prior proceedings terminated in favor of the present plaintiff;" (ii) there was an "absence of probable cause for those proceedings;" (iii) defendants acted out of "malice, defined as a purpose other than that of securing a proper adjudication of the claim;" and

(iv) a "special injury . . . flow[ed] directly from the other proceeding." <u>Payton v. City of Detroit</u>, 536 N.W.2d 233, 242 (Mich. 1995). "Failure to include all exculpatory facts is not adequate to sustain a suit for malicious prosecution" under state law. <u>Id.</u> at 395. Deering's briefing highlights episodes of the Detectives using racially derogatory language and using language reflecting "disdain" for Deering to suggest there was malice. Pl. Resp. at PageID.6784-6785.

The Court rejects the state law claim on the same grounds upon which the § 1983 claim founders: Deering has not met his burden of showing an absence of probable cause. <u>See</u> <u>Pinckney v. Traviglia</u>, No. 1:11-cv-290, 2012 WL 4464562, at *7 (W.D. Mich. Sept. 26, 2012) ("A lack of probable cause for the prosecution is an essential element of malicious prosecution claims under both the Fourth Amendment and Michigan law.").

### 4.   Conspiracy to Interfere with Civil Rights

To make a claim for conspiracy to interfere with civil rights, a plaintiff must show "that (1) a single plan existed, (2) the conspirators shared a conspiratorial objective to deprive the plaintiffs of their constitutional rights, and (3) an overt act was committed in furtherance of the conspiracy that caused the injury." <u>Robertson v. Lucas</u>, 753 F.3d 606, 622 (6th Cir. 2014) (punctuation modified). Conspiracy claims must be "pled with some degree of specificity" and "vague and conclusory allegations unsupported by material facts" are insufficient to support the claim. <u>Gutierrez v. Lynch</u>, 826 F.2d 1534, 1538 (6th Cir. 1987). However, evidence of an express agreement to conspire is not needed and "circumstantial evidence may provide adequate proof of conspiracy." <u>Weberg v. Franks</u>, 229 F.3d 514, 528 (6th Cir. 2000).

Deering alleges that the Detectives conspired to withhold exculpatory evidence. Pl. Resp. at PageID.6789. Specifically, Deering argues that the Detectives repeatedly assured witnesses such as Frame and Hawk that they would maintain their confidences and "control what gets out"

30

and "followed through on their assurances" by withholding the exculpatory evidence. <u>Id.</u> at PageID.6790-6792.   Additionally, Deering alleges that the Detectives' withholding of alleged offers of leniency made to the informants further "support[s] the existence of a conspiracy." <u>Id.</u> at PageID.6792.   The Detectives, on the other hand, reject the claim, arguing that "there is no evidence to suggest that the Defendants had an agreement, what the agreement was, or [that they] committed an overt act in furtherance of the conspiracy." Defs. Mot. at PageID.4596.

Although the Detectives' briefing is not fully developed on this issue,[5] the Court grants summary judgment in favor of the Detectives on the conspiracy claim.   It may well be the case that a reasonable jury could infer that the Detectives planned to withhold exculpatory evidence "from prosecutors for the purposes of tipping the scales against" Deering.   <u>Jackson v. City of Cleveland</u>, 925 F.3d 793, 817 (6th Cir. 2019).   However, even if there were circumstantial evidence sufficient to raise a triable issue that there was a failure to disclose exculpatory evidence in violation of <u>Brady</u>, Deering's claim fails as a matter of law under the intracorporate conspiracy doctrine.   The Sixth Circuit held in <u>Jackson</u> that if "all of the defendants are members of the same collective entity, they are not two separate people to form a conspiracy" for the purposes of a § 1983 action, unless the alleged acts fall outside the scope of employment.   <u>Jackson</u>, 925 F.3d at 817–818 (punctuation modified).   As in <u>Jackson</u>, the Detectives here are all members of the same police department and are alleged to have fabricated evidence and withheld the existence of exculpatory evidence from prosecutors. <u>Id.</u> at 817.   And, as in <u>Jackson</u>, there is no allegation raised

---

[5] The Defendants primarily rely on <u>Spadafore v. Gardner</u>, 330 F.3d 849, 854 (6th Cir. 2003), where the Sixth Circuit rejected a conspiracy claim after plaintiffs failed to identify "which of their constitutional rights" were violated and failed to make any specific allegations in their pleadings and brief.   By contrast, here, Deering clearly pleads that the alleged conspiracy violated his rights under the Due Process Clause of the Fourteenth Amendment and offers specific examples of evidence which he suggests would make a circumstantial case. <u>See</u> Amend. Compl. at PageID.643–650.

by Deering that the Detectives' actions relative to the alleged conspiracy fell outside the scope of their employment.  Id. at 819–820.

Therefore, the Court grants summary judgment on the conspiracy claim in favor of the Detectives.  See Virgil v. City of Newport, 545 F. Supp. 3d 444, 489 (E.D. Ky. 2021) (applying the intracorporate conspiracy doctrine to grant summary judgment in favor of detectives alleged to have conspired to fabricate and withhold evidence).

### 5.   Detention Without Probable Cause

Finally, Deering brings a claim against the Detectives for detention without probable cause. Incorporating the argument that there was probable cause here, the Court grants summary judgment in favor of the Detectives on this claim.  See Thomsen v. Sullivan Cnty., Tenn., No. 2:22-cv-5, 2023 WL 4633479, at *3 (E.D. Tenn. July 19, 2023) ("If probable cause exists for any charged offense, a Fourth Amendment claim fails.").

### B.   DEERING'S CLAIMS AGAINST FIRE INVESTIGATOR LEHTOLA

Deering has also raised four claims against Lehtola: (i) fabrication of evidence under § 1983; (ii) Brady violation; (iii) malicious prosecution under § 1983 and state law; and (iv) detention without probable cause under § 1983.  As with the Detectives, Lehtola claims qualified immunity, but the claim is not developed and must therefore be considered waived.  Evans v. Vinson, 427 F. App'x 437, 447 (6th Cir. 2011).  Therefore, the Court assesses the merits of each claim in turn.

### 1.   Fabrication of Evidence

Deering alleges that Lehtola fabricated evidence by misrepresenting the fire patterns and burn behavior to classify the fire as arson, by relying on "outdated and unreliable methodology," and by intentionally ignoring witness testimony that contradicted his conclusion that the fire started

on the front porch. Am. Compl. at PageID.640–641. In support of this claim, Deering presents a new evaluation of Lehtola's findings by two arson investigators who determined that "[n]o competent fire investigator" could have concluded that the fire was incendiary, that "Lehtola's investigation ran completely contrary to the Scientific Method" and reflect a "classic example of Expectation Bias and Confirmation Bias," and that the extensive nature of the damage would have precluded any finding that the fire originated on the porch. Trenkle Report at PageID.7060–7061 (Dkt. 156-7). Deering attempts to impute an intent to fabricate based on these conflicting expert reports and Lehtola's continued backing of his conclusions. Pl. Resp. to Defs. at PageID.6798 ("[E]vidence of Lehtola's intent is demonstrated, in part, by his insistence that he made no mistakes in his fire investigation."). But this cannot be so.

This case is analogous to Caminata v. Cnty. of Wexford where a state's arson investigator determined that the fire was caused by arson, but the conviction was later overturned when the University of Michigan Innocence Clinic alleged that the reconstruction of the fire was improper. 664 F. App'x 496, 498–499 (6th Cir. 2016). In a subsequent suit for fabrication of evidence, the Sixth Circuit affirmed a grant of summary judgment against the plaintiff, holding that "although [the expert's] investigation and conclusions may have been flawed, there is no evidence to suggest that his report contained deliberate omissions or reckless falsehoods." Id. at 501. The court continued that the new report characterizing the investigation as "huge mistakes that would not be expected of someone with [the expert's] level of experience" may "impugn[] the quality of [the original] investigation" but is "insufficient to establish knowing fabrication or deliberate or reckless falsehoods." Id. (punctuation modified). And notably, unlike in Caminata where the fire report was the basis for the reversal of conviction, the court vacating Deering's conviction noted that it was not doing so "on the basis of his fire science argument." Defs. Mot. at PageID.4582.

33

Deering seeks to rely on <u>Mills v. Barnard</u> where the Sixth Circuit accepted an inference that a DNA expert's report was intentionally falsified because the DNA evidence clearly exonerated the plaintiff. Pl. Resp. at PageID.6797–6798; <u>Mills v. Barnard</u>, 869 F.3d 473, 482 (6th Cir. 2017). However, <u>Mills</u> involved a motion to dismiss, not a motion for summary judgment, and the burden on the plaintiffs was to demonstrate plausibility, not a triable issue of fact. Here, Deering has provided no evidence that would raise an inference that Lehtola's errors, if any, were intentional. In fact, during cross examination, Lehtola conceded that it would be "very difficult" for an investigator to determine the exact cause and origin of the fire and even offered testimony that would support Deering's defense that the fire may have started inside the house. <u>Deering v. Perry</u>, No. 2:11-cv-10320, 2013 WL 1504749, at *5 (E.D. Mich. Apr. 12, 2013) (describing Lehtola's trial testimony). This undermines Deering's claim that Lehtola intended to fabricate his report and testimony to support the prosecution's case. An investigation's "lack of thoroughness might support an inference of negligence, but it does not demonstrate knowing or intentional behavior" required to support a claim for fabrication of evidence. <u>Ahlers v. Schebil</u>, 188 F.3d 365, 373–374 (6th Cir. 1999).

The Court grants summary judgment for Lehtola on the fabrication of evidence claim.

### 2.  <u>Brady</u> Violation

Deering alleges that Lehtola withheld exculpatory evidence, including that he had "fabricated his fire origin and cause conclusions" and that "the leading treatise by which all fire investigators were being trained and tested had debunked Lehtola's bases for his conclusions." Am. Compl. at PageID.636. While officers are obligated to turn over exculpatory evidence to the prosecutor's office, <u>see</u> <u>Moldowan v. City of Warren</u>, 578 F.3d 351, 378–379 (6th Cir. 2009), the obligation only extends to evidence whose "exculpatory value is apparent to the officer."

34

D'Ambrosio v. Marino, 747 F.3d 378, 389 (6th Cir. 2014) (punctuation modified).  Here, the Brady claim, therefore, requires Deering to show that Lehtola "knew that his reports were false and subsequently withheld this information from the prosecutor.  Otherwise, the exculpatory value of the information would not have been apparent to" Lehtola.  Caminata, 664 F. App'x at 502. Deering has not met this burden.

Deering relies on Townsend's deposition testimony speculating that Lehtola would have to disclose that he had used improper methods in his investigation and that he had overlooked material evidence in his analysis.  Pl. Resp. at PageID.6816–6817.  However, Lehtola himself has continued to deny any errors in his analysis or report, see Lehtola Dep. at PageID.7473 (Dkt. 156-31) ("[W]ould you say you made any mistakes in your investigation?  A: No.  Q: Would you do it the same way today?  A: I would.").  And aside from newly commissioned reports from experts casting doubt on Lehtola's conclusions, Deering has offered no evidence that the report was fabricated or that, more importantly, Lehtola knew that the report was wrong.  While Deering may certainly raise questions as to whether Lehtola followed proper procedures during his investigation, he has introduced no evidence that Lehtola intentionally did so and that he failed to disclose this impropriety to the prosecutor.  Thus, Deering has failed to show that Lehtola failed to turn over evidence with exculpatory value that was apparent to him, so the Court grants summary judgment in Lehtola's favor.

### 3.  Malicious Prosecution

Deering raises a malicious prosecution claim against Lehtola under both § 1983 and Michigan common law.  The claim for malicious prosecution is directly linked to his claim for fabrication of evidence.  Pl. Resp. at PageID.6805.  Given that Deering has introduced no evidence of fabrication, a faulty investigation by itself cannot give rise to a malicious prosecution claim.

Johnson v. Moseley, 790 F.3d 649, 656 (6th Cir. 2015) (clarifying that an allegation that an officer "failed to conduct a proper investigation amounts to no more than a charge of negligence or innocent mistake, not the sort of deliberate or reckless falsehood or otherwise blameworthy conduct required to make out a valid malicious prosecution claim" (punctuation modified)).

Deering alternatively argues that but for Lehtola's conclusion of the fire as incendiary, "there would be no crime" of felony-murder, and probable cause would not exist. Pl. Resp. at PageID.6805. However, probable cause for a crime of arson exists even in the absence of expert reports concluding that the fire was incendiary in nature if there is circumstantial evidence and inferences supporting such a cause. See People v. Nowack, 614 N.W.2d 78, 83 (Mich. 2000) ("In arson cases, the trier of fact usually draws inferences from circumstantial evidence" that include more than just an expert report.); Def. Mot. at PageID.4582–4586 (citing cases where defendants were convicted of arson in the absence of conclusive expert reports describing the fire as incendiary).

Deering relatedly argues that in the absence of Lehtola's report, Deering's alleged confessions to the three informants could not be used to support probable cause under the rule of corpus delecti. Pl. Resp. at PageID.6806. However, as discussed above, there were multiple sources that placed Deering at the scene of the crime or suggested a motive for Deering to commit the crime that could be used to corroborate the informants' testimony and that could form a basis for probable cause. This is in addition to Deering's inconsistent statements to police about his whereabouts on the day of the fire and his inability to establish an alibi to corroborate his version of events. Therefore, while Lehtola's report was an important basis for the finding of probable cause, Deering likely overstates that probable cause could not be established but for Lehtola's report.

Accordingly, both the federal and state law claim for malicious prosecution fail, and the Court grants summary judgment in Lehtola's favor.

### 4.   Detention Without Probable Cause

Incorporating the argument that there was probable cause, the Court also grants summary judgment in favor of Lehtola on this claim.  See Thomsen v. Sullivan Cnty., Tenn., No. 2:22-cv-5, 2023 WL 4633479, at *3 (E.D. Tenn. July 19, 2023) ("If probable cause exists for any charged offense, a Fourth Amendment claim fails.").

## C.   DEERING'S CLAIMS AGAINST PROSECUTOR TOWNSEND

Deering has brought two claims against Prosecutor Townsend: (i) fabrication of evidence under § 1983; and (ii) conspiracy to interfere with civil rights under § 1983.  Am. Compl. at PageID.638–650.   Specifically, Deering alleges that Townsend incentivized the jailhouse informants to provide false testimony in exchange for leniency in pending trials in other jurisdictions and withheld information of these alleged agreements from the jury.  Id.  Townsend has moved for summary judgment on both claims, arguing that he is entitled to absolute prosecutorial immunity and that, alternatively, there are no issues of material fact, and the claims fail as a matter of law.  Def. Mot. at PageID.3512–3513.  The Court grants Townsend's summary judgment motion on the grounds that he is entitled to absolute immunity.

"American law has long recognized absolute immunity for those whose special functions or constitutional status requires complete protection from suit," such as prosecutors.  Barnett v. Smithwick, 835 F. App'x 31, 35 (6th Cir. 2020) (punctuation modified).  "[T]ask[s]" attributed to prosecutors, such as "making judgment calls as to how pre-trial matters are handled, trials are conducted, witnesses are used, and evidence is presented," are "accompanied by absolute immunity from civil liability."  Price v. Montgomery Cnty., 72 F.4th 711, 719 (6th Cir. 2023).  So

37

broad is the scope of this immunity that it even extends to "unquestionably illegal or improper conduct, including instances where a defendant is genuinely wronged." Id. (punctuation modified).

Even the "knowing use of false testimony" at trial is entitled to absolute immunity because this decision is "intimately associated' with the judicial phase of the criminal process." Spurlock v. Thompson, 330 F.3d 791, 797 (6th Cir. 2003) (punctuation modified). Prosecutors can only be liable if their actions are "not intimately associated with the judicial process" such as if they engage in "investigative" or "administrative" acts, such as giving legal advice to police, providing "investigative efforts to obtain an arrest warrant" before probable cause is established, or directing a police investigation. Price, F.4th at 719-720. The prosecutor seeking immunity bears the burden of proving that immunity is justified. Burns v. Reed, 500 U.S. 478, 486 (1991).

Here, there is no evidence that Townsend undertook investigatory functions outside of his prosecutorial role or that he acted as anything other than as advocate for the state. Townsend was not involved with the case until 2005, five years after the fire and several years after the Detectives had already documented Deering's alleged confessions to the jailhouse informants. Defs. Mot. at PageID.3519. Deering cannot, therefore, claim that Townsend was involved in developing or fabricating Deering's alleged confessions to the informants.

Deering alternatively attempts to claim that Townsend acted outside his prosecutorial role when he helped secure a dismissal of a case for one of the informants, McMorris, in a different jurisdiction in exchange for McMorris's testimony at trial. Pl. Resp. at PageID.8469–8476. To do so, Deering cites to Rouse v. Stacy, where the Sixth Circuit held that a prosecutor's conduct must be limited to a legitimate prosecutorial duty to be entitled to absolute immunity and that ordering assault of a witness to secure their testimony falls outside the scope of this duty. 478 F.

App'x 945, 952–953 (6th Cir. 2012).  However, <u>Rouse</u> itself favorably cites to a Second Circuit case where the court recognized that a "prosecutor's offer to forgo prosecution in exchange for certain types of concessions" is entitled to absolute immunity because the "demand was not 'foreign to the prosecutor's office.'"  <u>Rouse</u>, 478 F. App'x 945, 952 (6th Cir. 2012) (describing and quoting <u>Schloss v. Bouse</u>, 876 F.2d 287, 291–292 (2d Cir. 1989)).

While Deering objects that Townsend acted to influence a different prosecutor in a different jurisdiction, any such action was "interdependent" with Townsend's control over the presentation of the Deering case that he was prosecuting, <u>Schloss</u>, 876 F.2d at 291, and "the conduct at issue was in furtherance of genuine prosecutorial interests," <u>Price</u>, 72 F.4th at 720.  "[S]imply stating that the prosecutor[] acted outside [his] traditional prosecutorial duties does not make it so." <u>Huffer v. Bogen</u>, 503 F. App'x 455, 460 (6th Cir. 2012) (punctuation modified).  And conduct regarding which evidence to disclose, including "the non-disclosure of exculpatory information," is likewise protected under absolute immunity.  <u>Jones v. Shankland</u>, 800 F.2d 77, 80 (6th Cir. 1986) (noting that "use of perjured testimony," "non-disclosure of exculpatory information," "conflict of interest problems," and "cover up allegations which merely appear to be restatements of the prosecution's claimed failure to disclose exculpatory information" are all "related to the acts of an advocate and thus come within the area of prosecutorial immunity").[6]

Accordingly, the Court grants Townsend's summary judgment motion on the grounds of absolute immunity.

### III.    CONCLUSION

---

[6] Deering's complaint did not raise a <u>Brady</u> claim against Townsend, only against the Detectives and Lehtola, <u>see</u> Am. Compl. at PageID.634, and therefore the merits of a <u>Brady</u> claim are not addressed.

For the reasons explained above, the Court (i) denies Deering's motion for summary judgment (Dkt. 138); (ii) grants Townsend's motion for summary judgment (Dkt. 136); and (iii) and grants Detectives' motion for summary judgment in part (Dkt. 145).

**SO ORDERED.**

Dated: July 2, 2025                    s/Mark A. Goldsmith
Detroit, Michigan                      MARK A. GOLDSMITH
                                       United States District Judge

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First-Class U.S. mail addresses disclosed on the Notice of Electronic Filing on July 2, 2025.

                                       s/Joseph Heacox
                                       JOSEPH HEACOX
                                       Case Manager